United States Court of Appeals
Fifth Circuit

**F I L E D**

December 11, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 02-11096

BILLY RAY NELSON,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, KING, JOLLY, HIGGINBOTHAM, DAVIS, SMITH,
WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS,
CLEMENT, PRADO, and OWEN, Circuit Judges.

CARL E. STEWART, Circuit Judge:

A panel of this court previously affirmed the district court's
denial of Billy Ray Nelson's habeas corpus petition challenging his
sentence on the ground that the Texas capital-sentencing procedure
failed to give constitutionally sufficient effect to his mitigating
evidence, in violation of *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302
(1989). *See Nelson v. Cockrell*, 77 F. App'x 209 (5th Cir. Aug. 12,
2003) (unpublished). Nelson petitioned the Supreme Court for writ
of certiorari. The Supreme Court granted the petition, vacated our

judgment, and remanded the case to this court for reconsideration in light of the Supreme Court's decision in *Tennard v. Dretke*, 542 U.S. 274 (2004). *Nelson v. Dretke*, 542 U.S. 934 (2004). On remand, a panel of this court once again affirmed the district court's denial of Nelson's habeas corpus petition. *See Nelson v. Dretke*, 442 F.3d 282 (5th Cir. 2006). Having ordered rehearing en banc, *Nelson v. Dretke*, 442 F.3d 912 (5th Cir. 2006), we again reconsider the application of *Penry I* and its progeny to Nelson's case. We conclude that, on the facts presented here, there is a reasonable likelihood that the Texas capital-sentencing scheme precluded the jury from giving full effect to Nelson's mitigating evidence as required by the Supreme Court; accordingly, we REVERSE the district court's denial of habeas relief and REMAND with instructions to grant the writ of habeas corpus.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 11, 1991, a Texas jury found Nelson guilty of capital murder for the February 23, 1991, slaying and brutal sexual assault of his neighbor, Charla Wheat. Evidence presented during the guilt/innocence phase of trial revealed the following: Nelson gained entrance to Wheat's apartment by asking if he could use her phone. Once inside, he cut the telephone cord to prevent her from calling for help and then proceeded to stab her. He then found Wheat's roommate, Carol Maynard, who was five months pregnant at the time, and forced her to get out of bed and enter the living

2

room, where Wheat was on her knees bleeding from her stab wounds. Nelson told the women to remove their clothing and threatened to kill them if they refused. He then forced the women to perform sexual acts on him and each other. Thereafter, he stabbed Maynard in the neck and proceeded to strike Wheat. Nelson left briefly but Wheat began screaming and he returned. While Maynard pretended to be dead, Nelson struck and stabbed Wheat until she died. He then left the women's apartment.

At the sentencing phase of the trial, Nelson presented the following mitigating evidence, which we will discuss more fully *infra*: (1) he was rejected by his mother, who had completely abandoned him by age 14 ("abusive childhood" evidence); (2) he abused drugs and alcohol ("substance abuse" evidence); (3) he has troubled relationships with his brother and with women; (4) he had a child out of wedlock, with whom he was not permitted to have a relationship; and (5) a psychiatrist testified he was suffering from borderline personality disorder ("mental disorder" evidence). For a jury to impose the death penalty at the time of Nelson's trial, Article 37.071(b) of the Texas Code of Criminal Procedure required the jury to answer two special issue questions concerning evidence presented in mitigation: "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" ("the deliberateness special

3

issue"); and "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" ("the future-dangerousness special issue").[1] The jury answered both special-issue questions in the affirmative, sentencing Nelson to death. Nelson appealed his sentence and conviction to the Texas Court of Criminal Appeals; that court affirmed, *Nelson v. Texas*, 864 S.W.2d 496 (Tex. Crim. App. 1993), and Nelson's conviction became final when the Supreme Court denied certiorari review, *Nelson v. Texas*, 510 U.S. 1215 (1994).

Nelson filed a state petition for writ of habeas corpus in September 1997, arguing that the Texas capital sentencing scheme, i.e., the two special-issue questions, failed to ensure that the jury could give the constitutionally required consideration of and effect to his mitigating evidence of his mental disorder, abusive childhood, and substance abuse under *Penry I*, 492 U.S. 302. He also filed a second petition in February 1998, alleging additional claims. The Texas Court of Criminal Appeals denied the writ based on the findings and recommendations of the trial court. *Ex parte Nelson*, No. 49,886-01 (Tex. Crim. App. Oct. 10, 2001).

---

[1]Although the Texas legislature amended the special issues sentencing scheme in 1991, Nelson was sentenced under the pre-amendment version of the special issues. In some cases, the jury was also given a third special issue addressing provocation. Nelson's jury did not receive a provocation instruction, and therefore we do not address that aspect of the pre-amendment special issues sentencing scheme here.

Specifically, with regard to Nelson's *Penry* claims, the Texas Court of Criminal Appeals recognized that, to be constitutional, "a death penalty procedure must allow the jury to consider all relevant mitigating evidence." *Ex parte Nelson*, No. 8,214 at 88 (118th Judicial District Howard County, Tex. July 10, 2001) (findings of fact and conclusions of law). The court also recognized that where the defendant's mitigating evidence is beyond the scope of the special issues, and the jury is unable to give effect to its reasoned moral response to the mitigating evidence, the procedure is unconstitutional as applied to the defendant. *Id.* In applying the law to the facts of Nelson's case, the court noted that Nelson's evidence of drug and alcohol abuse had no mitigating relevance beyond the scope of the special issues. *Id.* at 89. Moreover, with regard to the other mitigating evidence presented,

> [t]he Court instructed the jury on the charge on punishment, "You should consider and give effect in answering each issue to your evaluation of all of the evidence before you, including all aspects of the background and character of the defendant and the circumstances of the crime." . . . The jury charges and special issues allowed the jurors to give effect to all presented mitigating evidence in their answers to the special issues including the intoxication of [Nelson] at the time of the offense.

*Id.* at 90. Therefore, the court concluded that the procedure was constitutional as applied. The court dismissed Nelson's subsequent habeas petition as an abuse of the writ. *Ex parte Nelson*, No. 49,886-02 (Tex. Crim. App. Oct. 10, 2001).

Nelson filed a petition for writ of habeas corpus in the federal district court in August 2002. The district court rejected Nelson's *Penry* claim for failing to meet the requirements of our now-defunct "constitutional-relevance" test.[2] A panel of this court granted Nelson a certificate of appealability ("COA") on this issue; however, the panel ultimately affirmed the district court's denial of habeas relief. Nelson petitioned the Supreme Court for writ of certiorari, and the Supreme Court granted the petition, vacated the panel's judgment, and remanded the case to this court for reconsideration in light of the Supreme Court's decision in *Tennard*, 542 U.S. 274. On remand, a panel of this court once again affirmed the district court's denial of habeas relief. All three panel members concurred in the judgment; however, there was no consensus on the correct methodology for analyzing Nelson's claim.[3] Accordingly, this court ordered rehearing en banc, and we once

---

[2]The "constitutional-relevance" test required that petitioner's evidence show "(1) a 'uniquely severe permanent handicap[ ] with which the defendant was burdened through no fault of his own' and (2) that the criminal act was attributable to this severe permanent condition." *Davis v. Scott*, 51 F.3d 457, 460-61 (5th Cir. 1995) (citations omitted) (alteration in original). As discussed below, in *Tennard v. Dretke*, 542 U.S. at 275, the Supreme Court rejected the constitutional relevance test and reaffirmed that the standard for relevance is "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (internal quotations omitted).

[3]Chief Judge Jones authored an opinion; Judge Stewart concurred in the judgment only; and Judge Dennis filed a concurring opinion. *Nelson v. Dretke*, 442 F.3d 282.

6

again reconsider the application of *Penry* in light of *Tennard* to the facts of Nelson's case.[4]

## II. DISCUSSION

### A.    Standard of Review

Because Nelson filed his § 2254 habeas petition after April 24, 1996, this habeas proceeding is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Fisher v. Johnson*, 174 F.3d 710, 711 (5th Cir. 1999). We have jurisdiction to resolve the merits of Nelson's habeas petition because, as stated above, we granted him a COA on his *Penry* claim. *See Nelson v. Dretke*, 442 F.3d at 284; *see also* 28 U.S.C. § 2253(c)(1).

Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

---

[4]We note that the Supreme Court granted certiorari in *Brewer v. Dretke*, 442 F.3d 273 (5th Cir.), *cert. granted*, 127 S. Ct. 433 (2006)*, Cole v. Dretke*, 418 F.3d 494 (5th Cir. 2005), *cert. granted sub nom. Abdul-Kabir v. Quarterman*, 127 S. Ct. 432 (2006), and *Ex Parte Smith*, 185 S.W.3d 455 (Tex. Crim. App.) *cert. granted sub nom. Smith v. Texas*, 127 S. Ct. 377 (2006).

7

the State court proceeding." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 402-13 (2000). A state court's decision is "contrary to" clearly established federal law if (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (internal quotation marks omitted). A state court's application of clearly established federal law is "unreasonable" within the meaning of AEDPA when the state court identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an objectively unreasonable manner. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

A writ of habeas corpus may also issue if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under AEDPA, a state court's factual findings are "presumed to be correct" unless the habeas petitioner rebuts the presumption through "clear and convincing evidence." *Id.* § 2254(e)(1); *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

We review the district court's conclusions of law regarding the state court's application of federal law de novo, and we review

the district court's findings of fact, if any, for clear error. *Collier v. Cockrell*, 300 F.3d 577, 582 (5th Cir. 2002).

**B.    Clearly Established Federal Law**

Under AEDPA, our duty is to determine whether the state court's determination was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court at the time that Nelson's conviction became final in 1994. *See Williams*, 529 U.S. at 405. In *Tennard* and *Smith v. Texas*, two recent cases involving *Penry* claims, the Supreme Court unequivocally stated that the relevant inquiry under its precedent was whether there was a reasonable likelihood that the jury would interpret the Texas special issues in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence. *See Tennard*, 542 U.S. at 288-89; *see also Smith v. Texas*, 543 U.S. 37, 38 (2004) (per curiam). This "full-effect" standard requires that a juror be able to express his reasoned moral response to evidence that has mitigating relevance beyond the scope of the special issues; i.e., a juror cannot be precluded from electing a sentence less than death if he believes that the mitigating evidence offered makes the defendant less morally culpable for the crime, even if he nonetheless feels compelled to answer the two special issues in the affirmative. *See Penry v. Johnson* (*Penry II*), 532 U.S. 782, 797 (2001); *Penry I*, 492 U.S. at 320. A review of the Supreme Court's decisions in this area

9

demonstrates that this "full-effect" standard was clearly established by the time that Nelson's conviction became final.

### 1. *Jurek v. Texas* and the Immediate Post-*Furman* Cases

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court held that state capital-sentencing schemes allowing the death penalty to be "wantonly and . . . freakishly imposed" by permitting unbridled discretion in sentencing violated the Eighth and Fourteenth Amendments. *Id.* at 310 (Stewart, J., concurring). After *Furman*, states began to rewrite their death penalty statutes, restricting the classes of death-penalty eligible offenders and channeling jurors' discretion in sentencing in an attempt to comply with the Supreme Court's directive. Specifically, Texas responded to *Furman* with the "special issues" capital-sentencing scheme at issue in this case, which was designed to guide jurors' consideration of mitigating evidence offered in the sentencing phase of capital cases.

The immediate post-*Furman* Supreme Court cases addressing this and other sentencing schemes attempted to strike a balance between satisfying two competing constitutional requirements–the requirement of "individualized sentencing" that takes into account the unique facts of each case and each defendant, and the requirement of preventing the arbitrary imposition of the death penalty that can result from giving the sentencer unfettered discretion. These cases announced the principles that would

underlie the Supreme Court's later pronouncement that a capital sentencing scheme must allow the sentencer to give full effect to all of the defendant's mitigating evidence.

In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court upheld the facial constitutionality of the Texas special-issues sentencing scheme on the same day that it ruled on the validity of the post-*Furman* death penalty statutes of four other states. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (upholding the facial constitutionality of Georgia's capital-sentencing scheme, which narrowed the class of death-eligible offenders and guided the sentencer's consideration of mitigating and aggravating evidence); *Proffitt v. Florida*, 428 U.S. 242 (1976) (upholding the facial constitutionality of Florida's capital-sentencing scheme, which narrowed the class of death-eligible offenders and guided the sentencer's consideration of mitigating and aggravating evidence); *Woodson v. North Carolina*, 428 U.S. 280 (1976) (striking down North Carolina's mandatory capital-sentencing scheme because it gave sentencers no discretion to impose the death penalty for certain crimes); *Roberts v. Louisiana*, 428 U.S. 325 (1976) (striking down Louisiana's capital-sentencing scheme requiring the imposition of the death penalty for certain crimes). In *Jurek*, a plurality of the Court explained that, while the Texas sentencing scheme was constitutional on its face, "[a] jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence

11

should be imposed, but also why it should not be imposed." *Jurek*, 428 U.S. at 271 (plurality opinion) (citing *Woodson*, 428 U.S. at 303-05); *see also Roberts*, 428 U.S. at 334-36 (plurality opinion). Therefore, "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Jurek*, 428 U.S. at 272. While observing that the future-dangerousness special issue allowed consideration of *some* types of mitigating evidence, the *Jurek* plurality also left room for as-applied challenges to the Texas sentencing scheme, noting that the Texas Court of Criminal Appeals had not yet interpreted the deliberateness and provocation special issues. *Id.* at 272 n.7 ("[I]t is as yet undetermined whether or not the jury's consideration of those questions would properly include consideration of mitigating circumstances.").

 2. ***Lockett v. Ohio* and *Eddings v. Oklahoma***

Echoing these post-*Furman* concerns that the sentencer be able to consider and give effect to mitigating evidence in a constitutionally adequate way, the Supreme Court in *Lockett v. Ohio*, 438 U.S. 586 (1978), struck down Ohio's death penalty statute, which allowed the sentencer to impose a sentence less than death for certain crimes only if the mitigating evidence showed that (1) the victim induced or facilitated the offense, (2) the offense was a result of duress, coercion, or strong provocation, or (3) the offense was a product of psychosis or mental retardation.

12

A plurality of the Court explained that this sentencing scheme, which allowed the sentencer to consider some aspects of the mitigating evidence presented but not others, was unconstitutional because

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604 (plurality opinion); *see also Kansas v. Marsh*, 126 S. Ct. 2516, 2525 (2006) (noting that the Ohio sentencing scheme in *Lockett* was unconstitutional "because, by limiting a jury's consideration of mitigation to three factors specified in the statute, *it prevented sentencers in capital cases from giving independent weight to mitigating evidence militating in favor of a sentence other than death*") (emphasis added). Four years later, in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), a majority of the Court adopted the *Lockett* plurality's reasoning to vacate an Oklahoma death sentence where the sentencing judge refused to consider, *as a matter of law*, the defendant's mitigating evidence of his abusive childhood and treatable emotional disturbance. The Court rejected the state appellate court's application of a heightened-relevance standard to the mitigating evidence, noting that while the sentencer can "determine the weight to be given relevant mitigating evidence," it "may not give it no weight by excluding such evidence

13

from [its] consideration." *Id.* at 115; *see also Marsh*, 126 S. Ct. at 2525 (observing that, in *Eddings*, "a majority of the Court held that a sentencer may not categorically refuse to consider any relevant mitigating evidence").

### 3. *Franklin v. Lynaugh*

The Court considered an as-applied challenge to the Texas capital-sentencing scheme for the first time in *Franklin v. Lynaugh*, 487 U.S. 164 (1988). There, the Court held that the special issues allowed the jury to give constitutionally adequate effect to the petitioner's mitigating evidence of good behavior during a previous term of imprisonment. A plurality of the Court stated that, because the petitioner's evidence of good prison behavior did not have mitigating significance independent of its relevance to the petitioner's propensity to commit future crimes, "[i]n resolving the [future-dangerousness special issue] the jury was surely free to weigh and evaluate petitioner's disciplinary record as it bore on his 'character'–that is, his 'character' as measured by his likely future behavior." *Id.* at 177-78. Justice O'Connor concurred separately, emphasizing that, although *Jurek* upheld the facial validity of the Texas capital sentencing scheme, and in this case the mitigating relevance of all of the petitioner's evidence was within the scope of the special issues,

> [i]f . . . petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral

culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation. In my view, however, this is not such a case.

*Id.* at 185 (O'Connor, J., concurring).

### 4. *Penry I*

The very next term, the Supreme Court considered just such a case in *Penry I*, 492 U.S. 302. The *Penry I* Court held that habeas relief was appropriate because a juror presented with the Texas special issues could not have given effect to the full scope of the mitigating evidence that had been presented at the sentencing phase. Penry, a death-row habeas petitioner, had offered mitigating evidence at sentencing of (1) a low I.Q. indicating likely mental retardation; (2) an organic brain disorder that prevented him from appreciating the wrongfulness of his conduct or conforming his behavior to the law; (3) a troubled, abusive upbringing; and (4) an anti-social personality disorder. Penry argued that the Texas special issues, as applied in his case, were an inadequate vehicle to allow the jury to consider or give effect to this evidence, because the evidence had mitigating relevance beyond the scope of the special issues. The Court, with Justice O'Connor writing for the majority, first held that granting Penry the relief he requested would not announce a new rule on collateral review in violation of *Teague v. Lane*, 489 U.S. 288 (1989), because granting

15

such relief was "dictated by *Eddings* and *Lockett*." *Penry I*, 492 U.S. at 317.

The Court then granted the habeas petition, emphasizing that "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319. Only then can the sentence imposed "'reflect a reasoned *moral* response to the defendant's background, character, and crime.'" *Id.* (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Indeed, as "both the concurrence and dissent in *Franklin* understood," *Jurek*, in which the Court upheld the facial validity of the Texas capital-sentencing scheme, "rest[ed] fundamentally on the express assurance that the special issues would permit the jury to *fully* consider *all* the mitigating evidence a defendant introduced that was relevant to the defendant's background and character and to the circumstances of the offense." *Id.* at 321 (emphasis added).

In Penry's case, however, the Court held that the evidence of mental retardation and abusive childhood had mitigating relevance beyond the scope of the deliberateness and future-dangerousness issues, because it also spoke to Penry's moral culpability; therefore, the jury was unable to give effect to the mitigating evidence in a manner consistent with the Eighth Amendment. First, with regard to the deliberateness special issue, the Court reasoned

16

that, although a jury could give *partial* effect to Penry's mental retardation and abusive past by finding that his actions were not deliberate, a jury could also conclude that Penry acted deliberately but, because of his mental retardation and abusive childhood, "was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood." *Id.* at 322-23 (quoting *California v. Brown*, 479 U.S. at 545 (O'Connor, J., concurring)). Without a special instruction enabling the jury to give effect to the impact of Penry's mitigating evidence on his moral culpability, the jury lacked an adequate vehicle through which to express its "reasoned moral response" to this evidence. Second, the Court held that the future-dangerousness instruction was likewise constitutionally inadequate because, in this case, "Penry's mental retardation and history of abuse is . . . a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id.* at 324. Because Penry's mitigating evidence, viewed through the lens of future dangerousness, "is relevant only as an *aggravating* factor[,] . . . '[i]t did not allow the jury to consider a major thrust of Penry's evidence as mitigating evidence.'" *Id.* at 323-24 (quoting *Penry v. Lynaugh*, 832 F.2d 915, 925 (5th Cir. 1987)).

Although the Court did not expressly use the words "full effect" in *Penry I*, its reasoning makes clear that "full effect" is

17

what it meant. *See, e.g.*, *Penry I*, 492 U.S. at 323 ("In the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence *as it bears on his personal culpability*, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue.") (emphasis added); *id.* at 318-19 ("Penry argues that those assurances were not fulfilled in his particular case because, without appropriate instructions, the jury could not fully consider and give effect to the mitigating evidence of his mental retardation and abused childhood in rendering its sentencing decision."). Further, even the dissent in *Penry I* recognized that the Court was applying a full-effect standard:

> that the constitutionality turns on whether the questions allow mitigating factors not only to be considered (and, of course, given effect in answering the questions), *but also to be given effect in all possible ways, including ways that the questions do not permit. . . .* What the Court means by "fully consider" (what it must mean to distinguish *Jurek*) *is to consider for all purposes, including purposes not specifically permitted by the questions*.

*Penry I*, 492 U.S. at 355 (Scalia, J., dissenting) (citation omitted). Thus there can be no doubt that the *Penry I* Court applied a standard requiring the jury to be able to give *full* consideration and *full* effect to a defendant's mitigating evidence.

The State contends that the "full effect" language in *Penry I* and its progeny "is merely dicta, because it would otherwise

18

overrule *Jurek*"; however, this argument mischaracterizes the holding in *Jurek*, which upheld only the *facial* validity of the Texas special issues scheme. *See Jurek*, 428 U.S. at 272 (stating that "the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors," but also noting that "it is as yet undetermined whether or not the jury's consideration of [the special issues] would properly include consideration of mitigating circumstances" in every situation). The *Penry I* Court's holding was a case-specific application of *Jurek*, which expressly left room for as-applied challenges. *See Penry I*, 429 U.S. at 320 ("[B]oth the concurrence and the dissent understood *Jurek* as resting fundamentally on the express assurance that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced that was relevant to the defendant's background and character and to the circumstances of the offense."). That *Jurek* involved only a facial challenge to the Texas statute is apparent not only from the Court's decision in *Penry I*, holding the Texas statute unconstitutional as applied, but also from the Court's decisions in as-applied challenges to the constitutionality of the death penalty procedures in other states. As discussed above, the Supreme Court upheld facial challenges to the death penalty procedures in Georgia and Florida at the same time that it upheld the facial challenge to the Texas statute. *See*

*Gregg v. Georgia*, 428 U.S. 153; *Proffitt v. Florida*, 428 U.S. 242.

Nevertheless,

> after *Gregg* and *Proffitt* and prior to *Franklin*, [the
> Court] held unconstitutional specific applications of the
> same Georgia and Florida statutes [it] earlier had
> approved. *See Godfrey v. Georgia*, 446 U.S. 420 (1980)
> (vague and overly broad construction of aggravating
> factor rendered death sentence unconstitutional);
> *Hitchcock v. Dugger*,[481 U.S. 393 (1987),] (holding it
> unconstitutional to restrict jury's consideration of
> mitigating factors to those enumerated in the statute).

*Johnson v. Texas*, 509 U.S. 350, 384 (1993) (O'Connor, J., dissenting). Further, applying the full-consideration and full-effect standard does not require overruling *Jurek*, because "some types of mitigating evidence can be fully considered by the sentencer in the absence of special jury instructions." *Penry I*, 492 U.S. at 315 (citing *Franklin v. Lynaugh*, 487 U.S. at 175 (plurality opinion); *Franklin v. Lynaugh*, 487 U.S. at 185-86 (O'Connor, J., concurring in judgment)); *see also Graham v. Collins*, 506 U.S. 461, 521 (1993) (Souter, J., dissenting) (explaining that the petitioner's evidence of "[v]oluntary chores for and church attendance with a relative, and supplying some level of support for [his] children" could be considered through the future-dangerousness special issue). The Constitution requires a court to determine whether the special issues *as applied* enable the sentencer to give *full* consideration and *full* effect to the capital defendant's mitigating evidence; the "full-effect" standard is not–and has never been–inconsistent with the holding in *Jurek*.

20

**5.   *Graham v. Collins* and *Johnson v. Texas***

After *Penry I*, the Court addressed in *Graham*, 506 U.S. 461, and *Johnson*, 509 U.S. 350, two more as-applied challenges to the Texas special issues sentencing scheme, both of which denied relief to petitioners who claimed that the special issues failed to give effect to the mitigating evidence of their youth. In *Graham*, the Court held that *Teague* barred it from granting relief to a habeas petitioner who lodged a *Penry* challenge to his death sentence, which became final in 1984. The petitioner argued that the Texas special issues did not give constitutionally adequate effect to his mitigating evidence of good character and youth. Because the Court disposed of the case on *Teague* grounds, it did not address the substantive merits of the petitioner's *Penry* claim; instead, it considered whether granting the petitioner's requested relief would have constituted a new rule at the time the petitioner's sentence became final in 1984, holding that

> even if *Penry* reasonably could be read to suggest that Graham's mitigating evidence was not adequately considered under the former Texas procedures, that is not the relevant inquiry under *Teague*. Rather, the determinative question is whether reasonable jurists reading the case law that existed in 1984 could have concluded that Graham's sentencing was not constitutionally infirm. We cannot say that all reasonable jurists would have deemed themselves compelled to accept Graham's claim in 1984. . . . The ruling Graham seeks, therefore, would be a "new rule" under *Teague*.

*Id.* at 477.

Later that term, in *Johnson*, 509 U.S. 350, the Court considered a similar challenge on direct review. In *Johnson*, the only mitigating evidence that the petitioner offered was that of his youth at the time he committed the crime. The Court noted that, unlike other mitigating evidence that the Court had considered in previous cases, "[t]he relevance of youth as a mitigating factor derives from the fact that *the signature qualities of youth are transient;* as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* at 368 (emphasis added). Given these unique characteristics of youth, the Court held that this evidence did not lie beyond the reach of the sentencer applying the Texas special issues because "there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination." *Id.* The Court applied the standard set forth in *Boyde v. California*, 494 U.S. 370 (1990), to "determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Johnson*, 509 U.S. at 367 (quoting *Boyde*, 494 U.S. at 380). "Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar." *Id.* The

22

Court, again emphasizing the unique qualities of youth as a mitigating factor, distinguished *Penry I*, noting that "[u]nlike Penry's mental retardation, which rendered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue." *Johnson*, 509 U.S. at 369. Further, unlike the evidence of mental retardation at issue in *Penry I*, a juror's consideration of the impact of youth on the petitioner's conduct "is not independent of an assessment of personal culpability. . . . If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness." *Id.* at 369-70. Thus *Graham* and *Johnson* stand for the proposition that youth, which is different in kind and in mitigating effect from Penry's evidence of mental retardation and abusive childhood, can be fully considered and given effect through the special-issues sentencing scheme.

6.   *Penry II*

In *Penry II*, 532 U.S. 782, Justice Kennedy, the author of *Johnson*, joined the majority, and the Court reaffirmed that the standard is *full* effect, once again invalidating the application of the Texas special issues to Penry's mitigating evidence of mental

retardation and abusive upbringing. After the Court vacated Penry's death sentence in *Penry I*, the State of Texas retried Penry, who was again found guilty of capital murder and sentenced to death. During the sentencing phase of the second trial, the court submitted the same special issues to the jury that were the focus of *Penry I*, only this time the court also provided a supplemental "nullification" instruction. This instruction directed the jury to consider the effect of all of the mitigating evidence on Penry's personal culpability, and,

> [i]f you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to [Penry's] personal culpability . . . , a negative finding should be given to one of the special issues.

*Id.* at 790.

The Court, fully aware of the analytical constraints imposed by the deferential AEDPA standard of review, held that the Texas Court of Criminal Appeals had unreasonably applied the holding of *Penry I* when it held that the special issues and the nullification instruction were constitutionally adequate vehicles to give effect to Penry's mitigating evidence. Justice O'Connor, writing for the Court, stated:

> the key under *Penry I* is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." 492 U.S., at 319, 109 S. Ct. 2934 (emphasis added). *See also Johnson v. Texas*, 509 U.S. 350, 381(1993) (O'CONNOR, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" (emphasis in

24

original)). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *Penry I*, 492 U.S. at 328, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human being]' and has made a reliable determination that death is the appropriate sentence," *id.*, at 319 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 305 (1976)).

*Penry II*, 532 U.S. at 797. As the Court held in *Penry I*, the deliberateness and future-dangerousness issues were not broad enough to provide a vehicle that allowed the jury to express its reasoned moral response to the full mitigating impact of all of the evidence; neither was the State's attempted fix—the nullification instruction—constitutionally sufficient, because "it made the jury charge as a whole internally contradictory and placed law-abiding jurors in an impossible situation." *Id.* at 799. Under this scheme, there was still "at the very least, 'a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevent[ed] the consideration' of Penry's mental retardation and childhood abuse." *Id.* (quoting *Boyde*, 494 U.S. at 380). Because the State failed to define either special issue "in a way that would clearly direct the jury to consider *fully* Penry's mitigating evidence *as it bears on his personal culpability*," the Texas special-issues scheme was still unconstitutional as applied to Penry's mitigating evidence, and the Texas Court of Criminal Appeals' conclusion otherwise was an unreasonable application of

25

clearly established federal law. *Penry II*, 532 U.S. at 803 (emphasis added).

> 7. ***Tennard v. Dretke* and *Smith v. Texas***

The Supreme Court's decision in *Tennard*, in light of which this court must assess Nelson's *Penry* claim, reaffirms that a jury cannot be precluded from giving full effect to a defendant's mitigating evidence and leaves no doubt that this standard was in effect at the time that Nelson's conviction became final.[5] The Supreme Court handed down *Tennard* on June 24, 2004, reversing a panel of this court that had applied the aforementioned "constitutional-relevance" test to deny a COA on a death-row inmate's petition for habeas relief on *Penry* grounds. The Court explained that the petitioner, who argued that the Texas special issues sentencing scheme did not enable the sentencer to give full effect to his mitigating evidence of impaired intellectual functioning and low I.Q. score, was entitled to a COA, and that the

---

[5]Tennard's conviction became final when the Supreme Court denied certiorari on his direct appeal on June 28, 1991. *Tennard v. Texas*, 501 U.S. 1259 (1991). Under AEDPA, therefore, the Supreme Court's duty in *Tennard* was to determine whether the Texas Court of Criminal Appeals unreasonably applied federal law that was clearly established as of June 28, 1991. In light of AEDPA's mandate, the *Tennard* Court's insistence that a jury be able to consider and give effect to evidence with mitigating relevance to a defendant's moral culpability in addition to the special issues indicates that the "full-effect" standard  was well in place by 1991; indeed, as explained above, this standard, which is the same standard that the Court applied in *Penry I*, was "dictated by *Eddings* and *Lockett*." *Penry I*, 492 U.S. at 317.  Nelson's conviction became final in 1994, three years after Tennard's. *Nelson v. Texas*, 510 U.S. 1215 (1994).

26

lower courts had erred by applying the Fifth Circuit's "constitutional-relevance" test.

Specifically, the Supreme Court excoriated the Fifth Circuit for invoking its own restrictive gloss on the Court's *Penry I* decision, uniformly applying to *Penry* claims a heightened-relevance standard that "has no foundation in the decisions of this Court." *Tennard*, 542 U.S. at 284. The Court then reiterated that the appropriate-relevance standard in a capital case—as in any other case—is a low one:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard—"'"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"'"—applies. *Id.* at 440 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985)). . . . Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S. at 441.

*Tennard*, 542 U.S. at 284-85.

Then, "[o]nce this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Id.* at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377-378 (1990) (citing *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*,

27

455 U.S. 104 (1982); *Penry I*, 492 U.S. 302 (1989))); *see also Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (quoting *Eddings*, 455 U.S. at 114)).

The Court emphasized that, in assessing the relevance of mitigating evidence, a reviewing court should not weigh the severity or sufficiency of the evidence, except

> insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. *See Skipper* [*v. South Carolina*, 476 U.S. 1,] 7, n.2 ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating. For example, we have no quarrel with the statement . . . that 'how often [the defendant] will take a shower' is irrelevant to the sentencing determination[.")] . . . However, to say that only those features and circumstances that a panel of federal appellate judges deems to be "severe" (let alone "uniquely severe") could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it "might serve 'as a basis for a sentence less than death,'" *Skipper*, [467 U.S.] at 5.

*Tennard*, 542 U.S. at 286-87.

The Court concluded:

> the Fifth Circuit's screening test has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context. We therefore hold that the Fifth Circuit

28

assessed Tennard's *Penry* claim under an improper legal standard. *Cf. Miller-El v. Cockrell*, 537 U.S. [322, 341 (2003)] (holding, on certiorari review of the denial of a COA, that the Fifth Circuit had applied an incorrect standard by improperly merging the requirements of two statutory sections).

*Tennard*, 542 U.S. at 287.

Although the decision in *Tennard* principally focused on rejecting the "constitutional-relevance" standard, the Court also indicated that Tennard's evidence may have had relevance beyond the scope of the special issues, and that a jury might have been precluded from giving effect to that aspect of Tennard's mitigating evidence. The Court explained that a COA should have issued because

> [t]he relationship between the special issues and Tennard's low IQ evidence has the same essential features as the relationship between the special issues and Penry's mental retardation evidence. Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately. *See Penry I*, 492 U.S. at 322. A reasonable jurist could conclude that the jury might well have given Tennard's low IQ evidence aggravating effect in considering his future dangerousness . . . .

*Id.* at 288-89.

In its most recent pronouncement on the *Penry* issue, the Supreme Court in *Smith v. Texas*, 543 U.S. 37, once again reiterated that, to comply with the Eighth Amendment, a capital sentencing scheme must give full effect to all of a defendant's mitigating evidence. In a per curiam opinion issued shortly after *Tennard*, the Court reversed the Texas Court of Criminal Appeals' denial of state habeas relief, holding that the Texas special issues and a

29

supplemental nullification instruction similar to the one at issue in *Penry II* did not give full effect to the petitioner's mitigating evidence of the petitioner's (1) learning disabilities; (2) low I.Q. scores; and (3) childhood abuse and troubled upbringing.

First, the Court held that, in light of *Tennard*, the Texas Court of Criminal Appeals erred when it relied on the Fifth Circuit's "constitutional-relevance" test to dispose of the petitioner's *Penry* claim. Second, the Court held that, under its precedent, the Texas Court of Criminal Appeals erred when it held that the special issues and nullification instruction gave sufficient mitigating effect to the petitioner's mitigating evidence. The Court, reviewing its case law, stressed that "[i]n *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*), we held a similar 'nullification instruction' constitutionally inadequate because it did not allow the jury to give '*full* consideration and *full* effect to mitigating circumstances' in choosing the defendant's appropriate sentence. *Id*. at 797 (quoting *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (O'CONNOR, J., dissenting))." *Smith*, 543 U.S. at 38. The *Smith* Court therefore once again reaffirmed that the standard is *full* consideration and *full* effect.

The State's contention that *Smith* and *Penry II* are inapposite to the instant case because they involved a nullification instruction is not well taken. As we explained above, the nullification instruction was not an adequate solution to the

30

problem the Court identified in *Penry I*—namely, that the jurors could not give Penry's mitigating evidence full effect through the special issues. *Penry II*, 532 U.S. at 797 ("[T]he key under *Penry I* is that the jury be able to 'consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence.'" (emphasis and alteration in original) (quoting *Penry I*, 492 U.S. at 319)). Accordingly, the focus of our inquiry is not whether there was a nullification instruction, but whether the procedure, whatever it was, allowed the jury to express its reasoned moral response to the defendant's mitigating evidence. *See id.* And the standard for making that determination is whether there is a reasonable likelihood that the procedure precluded the jury from giving full consideration and full effect to the defendant's mitigating evidence.

This review of the relevant Supreme Court case law therefore establishes that, at the time Nelson's conviction became final in 1994, the clearly established law as announced by the Supreme Court was a full-effect standard. The *Penry II* Court left no doubt that full effect was the applicable standard, or that this was the standard that applied in *Penry I*. The debate has long since been over. Today, we make clear that we are following the Supreme Court's directive and applying the standard it articulated; i.e., whether there is a reasonable likelihood that the special issues precluded the jury from giving full consideration and full effect

to the defendant's mitigating evidence, including evidence that has mitigating relevance outside the scope of the special issues because it speaks to a defendant's moral culpability. This standard was "dictated by" the Supreme Court's earlier decisions in *Eddings* and *Lockett*, *see Penry I*, 492 U.S. at 317, and *Graham* and *Johnson* are not to the contrary. Moreover, the Court's most recent decisions in *Tennard* and *Smith* reaffirm that this standard was clearly established federal law at the time Nelson's conviction became final. Accordingly, we turn to the question presented in this case—whether the state court's determination that the Texas capital-sentencing scheme was constitutional as applied in Nelson's case was contrary to or an unreasonable application of clearly established law as announced by the Supreme Court.

## C. Application of Clearly Established Federal Law to Nelson's Case

The Texas Court of Criminal Appeals concluded that the special issues were constitutional as applied to Nelson. Because there is a reasonable likelihood that the jury was precluded from giving full effect to Nelson's mitigating evidence, we hold that the Texas Court of Criminal Appeals' determination was an unreasonable application of clearly established law as announced by the Supreme Court.

### 1. Nelson's Mitigating Evidence

The parties agree that, at the punishment phase of the trial, Nelson presented the following mitigating evidence of: (1) an

32

abusive childhood; (2) substance abuse; (3) troubled relationships with his brother and with women; (4) having had a child out of wedlock with whom he was not permitted to have a relationship; and (5) a mental disorder. Specifically, Nelson offered the testimony of his father, who described in great detail the emotional abuse and rejection that Nelson suffered at the hands of his mother while he was growing up. Nelson's father explained that Nelson was the second of two boys, and Nelson's mother, who had always wanted a girl, rejected Nelson from birth, refusing to care for him, "change him or feed him [or] anything." After Nelson's parents separated when Nelson was fourteen years old, his mother completely abandoned him, leaving and refusing to take him with her.

Nelson also presented testimony from Dr. John Hickman, a psychiatrist who personally interviewed and assessed Nelson. Dr. Hickman testified extensively about the symptoms of borderline personality disorder, which can manifest themselves in "psychotic outburst[s]" and a "lack of impulse control." According to Dr. Hickman, a person with borderline personality disorder has little insight into his own illness and may "periodically go through an outburst of feelings which can become very violent, very destructive," even though he exhibits normal behavior "75 to 80 percent" of the time. Dr. Hickman noted that Nelson in particular experiences "a lot of impulse and a lot of raw energy and anger . . . [that] he has no [insight] into whatsoever" as a result of his borderline personality disorder.

33

He further explained that borderline personality disorder can be especially "severe" in cases of maternal abandonment, and, in this case, Nelson's abusive upbringing and rejection by his mother engendered a "rage toward women" that was evidenced by the nature of the crime that he committed. Dr. Hickman observed that Nelson's borderline personality disorder was a consequence of growing up in a home where Nelson did not learn to control his anger and where he was subjected to psychologically abusive treatment by his mother, who told him that "he couldn't do anything right" and that "she didn't want him." In Dr. Hickman's judgment, at the time he committed the crime, Nelson "had a psychotic outburst" and was under the influence of "either a mental or physical form of duress" resulting from "his physical and psychological makeup." Dr. Hickman also stated that, in addition to being "psychologically abused" by his mother, Nelson had "some family history which indicates disregard and abuse for women" and that "it is almost as if he is trained to be that way." Additionally, Dr. Hickman noted that Nelson's substance abuse likely exacerbated the effects of Nelson's borderline personality disorder, describing "eruptive episodes, generally influenced by alcohol or cocaine, where all that primitive impulse comes out," which were "guaranteed to be self-destructive." In sum, Dr. Hickman observed that Nelson "has a morass of anger, hostility, given the combination of a borderline personality, given stress factors, given alcohol, given cocaine, all hell is going to break loose with him."

34

Although Dr. Hickman testified that borderline personality disorder can be treated in some cases, he indicated that borderline personality disorder is difficult to treat because persons with borderline personality disorder do not want to "admit they are weak and vulnerable" and often refuse to undergo therapy. Dr. Hickman estimated that in Nelson's case, it could take at least a year just to break down Nelson's "defenses" and convince him to participate in treatment; after that, Nelson would require "long psychotherapy—and I'm talking about two to five years. That is standard for borderline. And . . . medication." Dr. Hickman emphasized that this intensive psychotherapy would require "two or three times a week with . . . a therapist that can work with him" in addition to "the proper drug medication" and "a strict environment" where Nelson could "learn internal controls." Dr. Hickman noted that, even with such treatment, he could not guarantee Nelson's success, and "if he doesn't get treatment, I think we can predict dangerousness."

### 2. The Special Issues as Applied to Nelson's Mitigating Evidence

As a threshold matter, the State contends that *Penry* and its progeny apply only to a very narrow set of cases in which the mitigating evidence is "double-edged," i.e., has both aggravating and mitigating effect, and the future-dangerousness special issue gives the evidence only aggravating effect. Thus, according to the State, a *Penry* analysis in this case is not necessary. We disagree.

35

The Supreme Court has never limited the applicability of *Penry*–either explicitly or implicitly–to cases involving "double-edged" mitigating evidence. In *Penry I*, the Court's observation that Penry's evidence of mental illness was "two-edged" was just one of many reasons that the special issues were inadequate vehicles to give Penry's evidence full mitigating effect; it was not the determining factor. *See Penry I*, 492 U.S. at 324 (listing the "two-edged sword" nature of Penry's evidence as one of a number of reasons that the future-dangerousness issue could not give Penry's evidence full mitigating effect). Justice O'Connor's dissent in *Johnson* explains that placing too much weight on the Court's description of Penry's evidence as "two-edged" mischaracterizes the *Penry I* Court's reasoning:

> The second special issue was not inadequate because evidence worked only against Penry; it was inadequate because it did not allow the jury to give full effect to Penry's mitigating evidence. *Penry*, 492 U.S. at 323. Our discussion of the third special issue–whether the defendant's conduct was unreasonable in response to the provocation–also focused on the inability of a juror to express the view that Penry lacked "the moral culpability to be sentenced to death" in answering the question. *Id.* at 324-25. The point of *Penry* is clear: A death sentence resulting from application of the Texas special issues cannot be upheld unless the jurors are able to consider fully a defendant's mitigating evidence. *Accord*, *id.* at 355 (SCALIA, J., concurring in part and dissenting in part) (The Court today holds that "the constitutionality turns on whether the [special] questions allow mitigating factors not only to be considered . . . , *but also to be given effect in all possible ways, including ways that the questions do not permit*").

36

*See Johnson*, 509 U.S. at 386 (O'Connor, J., dissenting). Indeed, Chief Justice Rehnquist dissented from the Court's decision in *Tennard* arguing that Tennard's evidence was not "two-edged." *Tennard*, 542 U.S. at 292-93 ("In either case-contrary to *Penry I*-the evidence could be given mitigating effect in the second special issue. In short, low intelligence is not the same as mental retardation and does not necessarily create the *Penry I* "two-edged sword."). A majority of the Court declined to accept that argument in *Tennard* and, therefore, we cannot accept it here.

Further, the Court has indicated that *Penry* applies-or at least potentially could apply-in cases involving evidence that is not double-edged. *See, e.g.*, *Smith*, 543 U.S. 37 (reversing the state court's denial of habeas relief because the special issues could not give full effect to mitigating evidence of low I.Q. and troubled upbringing); *Tennard*, 542 U.S. 274 (holding that habeas petitioner was entitled to a COA on his *Penry* claim based on mitigating evidence of low I.Q. and impaired intellectual functioning). In short, the State urges this court to wrench one component of the Court's reasoning in *Penry I* out of context and use it as a dispositive screening test in our assessment of *Penry* claims. In effect, the State asks this court to develop another "restrictive gloss on *Penry I*," similar to the "constitutional-relevance" test that the Court struck down in *Tennard*. *Tennard*, 542 U.S. at 283. The Court has never used the consideration of whether

37

evidence is double-edged as a single-issue screening test as the State urges us to do; and, given the Court's strong admonition in *Tennard*, we decline to do so. Consequently, we turn now to the State's alternative argument that Nelson's evidence could be adequately considered through the two special issues.

### a. Deliberateness Special Issue

Nelson's mitigating evidence of borderline personality disorder and abandonment by his mother had relevance beyond the scope of the deliberateness special issue. As the Supreme Court observed in *Penry I*, a reasonable juror could have concluded that, while the murder was deliberate, Nelson was less morally culpable as a result of his borderline personality disorder and abusive childhood than a murderer without such a mental illness and similar upbringing might have been. *See Penry I*, 492 U.S. at 323-24; *see also Skipper v. South Carolina*, 476 U.S. 1, 13-14 (1986) (Powell, J., concurring in judgment) (stating that evidence concerning a defendant's "emotional history . . . bear[s] directly on the fundamental justice of imposing capital punishment"). Because a major mitigating thrust of evidence of a mental disorder and an abusive childhood is that such afflictions could reduce an offender's moral culpability, it is "reasonably likely" that a juror would not have been able to give full effect to his "reasoned moral judgment" regarding the full mitigating impact of Nelson's evidence through the narrowly worded deliberateness instruction.

38

*See, e.g., Penry II*, 532 U.S. at 797; *Penry I*, 492 U.S. at 322. Significantly, the Supreme Court has *never* held that the deliberateness issue alone is broad enough to give full effect to mitigating evidence that also bears on a defendant's moral culpability; indeed the Court's most recent opinion in *Smith v. Texas* suggests the contrary. There, the Court characterized Smith's evidence as follows:

> (1) he had been diagnosed with potentially organic learning disabilities and speech handicaps at an early age; (2) he had a verbal IQ score of 75 and a full IQ of 78 and, as a result, had been in special education classes throughout most of his time in school; (3) despite his low IQ and learning disabilities, his behavior at school was often exemplary; (4) his father was a drug addict who was involved with gang violence and other criminal activities, and regularly stole money from family members to support a drug addiction; and (5) he was only 19 when he committed the crime.

*Smith*, 542 U.S. at 41. Considering the nature of this evidence, the Court noted that, "just as in *Penry II*, the burden of proof on the State was tied by law to findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented." *Id.* at 48. Likewise, Nelson's mitigating evidence had relevance beyond the deliberateness special issue insofar as it bore on his moral culpability for the crime. Consequently, although the jury may have been able to give *partial* effect to this evidence through the deliberateness special issue, there is a reasonable likelihood that

39

it was unable to give full effect to this evidence, because it had relevance beyond whether Nelson acted deliberately.

### b. Future-Dangerousness Special Issue

Likewise, the future-dangerousness special issue cannot give Nelson's evidence full mitigating effect. The jury heard conflicting evidence about the treatability of Nelson's borderline personality disorder and about the efficacy of any possible treatment. According to the expert testimony, even assuming that Nelson's borderline personality disorder were treatable, success would depend on many factors. Based on this evidence, the jury could have easily concluded that it was unlikely that Nelson would successfully complete treatment. The State's expert, Dr. Grigson, testified that there was insufficient information to make a diagnosis of antisocial personality disorder, but repeatedly emphasized that "in [his] opinion there is no question whatsoever that [Nelson] will commit future acts of danger." In contrast, Nelson's expert, Dr. Hickman, diagnosed Nelson with borderline personality disorder. He further testified that, with treatment consisting of incarceration, two to five years of intensive psychotherapy two to three times a week, medication, and refraining from drug and alcohol abuse, Nelson may not be continuing threat. He opined that if Nelson did not receive treatment, he would pose a danger to society. He also explained that "the last thing a borderline wants to do is admit they are weak and vulnerable," and

40

thus borderline patients often resist treatment. Indeed, in its own closing, the State emphasized the strong possibility that Nelson would not receive the treatment he needed to keep his borderline personality disorder in check, and even if he did receive such treatment, there were no guarantees that the therapy would be effective to prevent future violence:

> Dr. Hickman said, if, if, if, if he is imprisoned long enough, if he undergoes psychotherapy, if he chooses to take his medication, and if he leaves dope and alcohol alone, then maybe, maybe he won't be a future danger. Look at Special Issue Number Two, ladies and gentlemen. There is not an asterisk next to that, there is not something referring you down here that says if, if, if, if. We look at the defendant right now, and right now even their witness [said], yes, he may be a danger.

Based on the expert testimony at trial, the jury might have concluded that Nelson could be treated, and therefore, it could have given *some* effect to this mitigating evidence within the context of the future-dangerousness special issue. But if the jury concluded that the condition was not treatable or that treatment was improbable, as the State argued, it would necessarily have to answer "yes" to the special issue. Just as in *Penry I* and *Penry II*, it is likely that a juror considering Nelson's evidence of borderline personality disorder would have felt that he could give the evidence only one possible effect via the future-dangerousness issue: Such a juror would have seen the evidence as only aggravating, because Nelson's borderline personality disorder and the difficulty of treating it increase the likelihood that Nelson

41

will act out violently again. Consequently, there would be no vehicle to give mitigating effect to his evidence of borderline personality disorder, i.e., no way for the jury to express its conclusion that even though he is likely to be dangerous in the future, his mental illness makes him unworthy of the death penalty. *Cf. Penry I*, 492 U.S. at 302 ("[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence."). And, also similar to *Penry I*, the jury was likely precluded from interpreting the future-dangerousness issue in a way that gave effect to the major mitigating thrust of the evidence, that it tends to lessen Nelson's moral culpability for the crime. *See Penry I*, 492 U.S. at 322-24.

The State and the dissenting opinions of Chief Judge Jones and Judge Owen argue that the evidence at issue here is more comparable to the evidence of youth at issue in *Johnson* and *Graham*. Specifically, they contend that, because borderline personality disorder can be a "transient" condition like youth, a jury could believe that Nelson would be *less* dangerous in the future, thereby giving full mitigating effect to the evidence. We disagree. This argument erroneously analogizes evidence of youth and evidence of mental illness. The Supreme Court in *Johnson* held that the future-dangerousness issue could give effect to both mitigating aspects of youth-likelihood of future violent behavior and moral

42

culpability—due to the uniquely transient nature of youth. *See Johnson*, 509 U.S. at 368 ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. . . . [T]here is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination."); *see also Eddings*, 455 U.S. at 115 ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). In this sense, the Supreme Court, which has never endorsed the extension of *Johnson* and *Graham* to treatable mental illness, has treated youth as sui generis, because it is a condition that is certain to pass.[6] In contrast, as acknowledged by Nelson's own expert witness, there was no guarantee that Nelson's borderline personality disorder

---

[6]The sui generis nature of youth in the death penalty context is perhaps best evidenced by the Supreme Court's categorical holding in *Roper v. Simmons*, 543 U.S. 551 (2005), that the Constitution prohibits the execution of persons who were under eighteen years of age at the time of their crime. *See id.* at 569 (noting that three unique characteristics of youth mitigate juveniles' moral culpability for certain behavior: "[a] lack of maturity and an underdeveloped sense of responsibility[, which] . . . often result in impetuous and ill-considered actions and decisions"; increased "vulnerab[ility] or susceptib[ility] to negative influences and outside pressures, including peer pressure"; and "that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed") (citing *Johnson*, 509 U.S. at 367; *Eddings*, 455 U.S. at 115).

43

would diminish over time. Dr. Hickman noted that, although borderline personality disorder is treatable, success is by no means certain and is expressly conditioned on intensive therapy that, a juror could conclude, the Texas prison system is unlikely to provide. In fact, Dr. Hickman's trial testimony indicated that, because of the severity of borderline personality disorder and patients' common resistance to therapy, successful treatment is often the exception rather than the rule. Unlike a jury considering evidence of youth, therefore, a reasonable likelihood existed that a jury considering Nelson's mitigating evidence of borderline personality disorder would have felt foreclosed from giving full mitigating effect to Nelson's evidence of his disorder via the future-dangerousness issue. Thus, based on the principles announced in *Penry I* and its progeny, the future-dangerousness special issue, like the deliberateness special issue, provided a constitutionally insufficient vehicle to allow a jury to express its reasoned moral response and give full effect to Nelson's mitigating evidence. The Texas Court of Criminal Appeals's holding to the contrary is an unreasonable application of clearly established federal law as announced by the Supreme Court.

This is not simply a matter of disagreement with the state court's conclusion that the jury could consider and give effect to Nelson's mitigating evidence through the special-issues sentencing scheme. We are mindful that under AEDPA a federal court may not

44

grant habeas relief simply because it disagrees with the state court's resolution of an issue; it may grant relief only if the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Indeed, Chief Judge Jones's dissent invokes this standard, asserting that our approach to the future-dangerousness issue improperly "relies upon a string of hypotheticals to create [a] *Penry* violation" and adopts an "attenuated theory of the jury deliberations [that] extends *Penry I* far beyond its intended boundaries." Chief Judge Jones's Dissent at 21 n.19; *see also* Judge Owen's Dissent. But rather than extending the reach of *Penry I* or any other case in violation of the AEDPA standard of review, our approach merely follows the Supreme Court's longstanding directive to determine only "whether the evidence is of such a character that it '*might* serve as a basis for a sentence less than death,'" which was clearly established federal law at the time that Nelson's conviction became final. *Tennard*, 542 U.S. at 287 (quoting *Skipper*, 467 U.S. at 5) (emphasis added).

In contrast, the alternative approach, upon which the dissenting opinions of Chief Judge Jones and Judge Owen base their conclusions that the Texas Court of Criminal Appeals did not unreasonably apply clearly established federal law, would require us, sitting as a federal appellate habeas court, to weigh the

45

evidence presented at sentencing in a manner that the Supreme Court in *Tennard* held was an unreasonable application of clearly established federal law at least as far back as 1991. *See id.* at 286-87. Like Nelson's case, *Tennard* reached the Supreme Court on federal habeas review and was governed by the AEDPA standard. As noted above, we measure clearly established federal law for AEDPA purposes as of the date that the defendant's conviction became final. While Tennard's conviction became final in 1991, Nelson's conviction did not become final until 1994. *See supra* note 4. Therefore, the principles that the Supreme Court in *Tennard* held had been clearly established in 1991 were certainly clearly established by the time that Nelson's conviction became final in 1994. Although Chief Judge Jones and Judge Owen correctly recite the AEDPA standard in their dissenting opinions, they simply fail to accept that *Tennard*--which stood for the propositions that (1) a reviewing court may not reweigh or reassess the mitigating evidence presented at sentencing, and (2) a jury must be able to give effect to the impact of that mitigating evidence on the defendant's moral culpability via the special issues--also set forth the federal law that was clearly established for the purposes of Nelson's case.

Specifically, the dissenting opinions of Chief Judge Jones and Judge Owen run afoul of *Tennard* by assuming that the jury in Nelson's case found that Nelson's borderline personality disorder

46

was treatable, and that the Texas Court of Criminal Appeals would therefore not have acted unreasonably in treating it as akin to the mitigating evidence of youth at issue in *Graham* and *Johnson*. However, we know from the record only that the jury determined that Nelson was a future danger after hearing conflicting expert testimony about whether he suffered from borderline personality disorder and, if so, whether it could be treated. Despite the purportedly definitive reading of the record contained in Chief Judge Jones's dissent, we cannot be certain of the precise reasons for the jury's future-dangerousness determination. Instead, we know that the jury could have arrived at its conclusion for *any* of the following reasons: (1) the jury believed that Nelson suffered from borderline personality disorder but that the disorder was not treatable; (2) the jury believed that Nelson suffered from borderline personality disorder that was treatable but that some other factor rendered Nelson a future danger; or (3) the jury did not believe that Nelson actually suffered from borderline personality disorder. To conclude that the mental illness at issue was treatable in the face of these multiple possibilities, the dissenting opinions of Chief Judge Jones and Judge Owen reassess and reweigh the evidence presented at sentencing, even though we,

47

sitting as a federal appellate habeas court, have no way of knowing why the jury determined that Nelson was a future danger.[7]

Weighing the evidence in this manner violates the Supreme Court's express admonition in *Tennard* that we not substitute our own interpretation of the evidence for that of the jury or assess the strength of the mitigating evidence presented except "insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." *Tennard*, 542 U.S. at 286. Just as the Supreme Court in *Penry I* made no determination as to whether the jury *actually believed* that Penry was mentally retarded based on the conflicting trial evidence, we may not conduct an

---

[7] Compare *Johnson*, in which the Supreme Court singled out youth, as opposed to other conditions that could be transitory, because its ephemeral nature is bound up in its mitigating impact such that a juror could not reasonably assess youth as a mitigating factor without taking into account this aspect of transience. *See Johnson*, 509 U.S. at 368 (emphasizing that the impact of youth on the defendant's conduct "is not independent of an assessment of personal culpability"). Because this transient quality is so subsumed within the mitigating relevance of youth, the Court did not inquire whether the jury might have found that Johnson was likely to mature as he grew up before it held that the jury could give full effect to youth through the future-dangerousness issue; the undisputed chronological fact of the defendant's age was enough. In contrast, under the approach favored by the dissenting opinions of Chief Judge Jones and Judge Owen in this case, when presented with mitigating evidence of a possibly treatable mental illness, an appellate habeas court must conduct such an inquiry into the jury's findings and weigh the evidence to determine whether the illness is treatable. Perhaps for this very reason, the Supreme Court, which spoke about youth in very specific terms in *Johnson*, has never extended *Johnson*'s reasoning to any other mitigating evidence--including possibly treatable mental illness-- that might have transient characteristics.

48

independent review of the conflicting evidence in this case to make a determination as to whether the jury actually believed that Nelson's mental illness was treatable. In short, under *Tennard*, which clarified the clearly established law in this area as of 1991, we may not graft a treatability test based on our view of the strength of the evidence onto the low relevance threshold as the dissenting opinions of Chief Judge Jones and Judge Owen propose, and neither may the Texas Court of Criminal Appeals. Rather, the only question we may ask regarding the jury's interpretation of the mitigating evidence presented at trial is "simply whether the evidence is of such a character that it '*might* serve as a basis for a sentence less than death.'" *Id.* at 287 (quoting *Skipper*, 467 U.S. at 5) (emphasis added).

Further, the Supreme Court has made it clear in *Boyde* and in *Johnson* (both issued before Nelson's conviction became final) that once the low relevance threshold is satisfied, rather than inquiring into or second guessing the jury's interpretation of the trial evidence, all a court must determine is whether a *reasonable likelihood* exists that the jury applied the instructions in a manner that precluded it from giving effect to the defendant's mitigating evidence as it pertains to the defendant's moral culpability. In the instant case, given the conflicting testimony regarding the treatability of Nelson's mental illness, there is certainly a reasonable likelihood that the jury felt precluded from

49

giving full effect to the impact of the evidence on Nelson's moral culpability via the future-dangerousness issue because it found that Nelson's illness could not be treated. *See Johnson*, 509 U.S. at 367 (explaining that the *Boyde* "reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence").

Therefore, rather than "extend[ing] *Penry I* far beyond its intended boundaries, without instructions from the Supreme Court," Chief Judge Jones's Dissent at 21 n.19, our approach is firmly grounded in Supreme Court precedent and consistent with the AEDPA standard of review. The alternative upon which the dissenting opinions of Chief Judge Jones and Judge Owen rely to affirm the state court's denial of habeas relief in this case--that we scour the trial record for evidence of treatability and substitute our interpretation of the evidence for that of the jury's--is not merely incorrect, but is an unreasonable application of clearly established federal law as announced by the Supreme Court. *See Tennard*, 542 U.S. at 288-89; *see also Smith*, 543 U.S. at 38; *Penry II*, 532 U.S. at 803; *Penry I*, 492 U.S. at 323; *Skipper*, 467 U.S. at 5.

This case is therefore different from the Supreme Court's recent decision in *Brown v. Payton*, 544 U.S. 133, 147 (2005), which Judge Clement discusses in her dissenting opinion. In *Payton*, the

Supreme Court reversed the Ninth Circuit's grant of habeas relief to a death-row petitioner who challenged the constitutionality of California's "factor (k)" jury instruction, concluding that the Ninth Circuit did not give proper deference to the state court's decision. Specifically, the Court held that "[i]t was not unreasonable for the state court to determine that the jury most likely believed that the evidence in mitigation, *while within the reach of the factor (k) instruction*, was simply too insubstantial to overcome the arguments for imposing the death penalty." *Id*. (emphasis added). In *Payton*, the state court held that the mitigating evidence of the defendant's religious conversion fell within the reach of the catch-all instruction directing the jury to consider "'[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,'" although the prosecutor argued to the jury that it could not consider this evidence. *Payton*, 544 U.S. at 137 (alteration in original) (quoting Cal. Penal Code Ann. § 190.3 (West 1988)). In reversing the Ninth Circuit's determination that the state court erred in denying habeas relief, the Supreme Court emphasized that the state court's holding was a reasonable interpretation of its prior decision in *Boyde*, 494 U.S. 370, in which the Court upheld the validity of the factor (k) instruction in similar circumstances. *See Payton*, 544 U.S. at 144 ("As the California Supreme Court recognized, like in *Boyde*, for the jury to have

51

believed it could not consider Payton's mitigation evidence, it would have had to believe that the penalty phase served virtually no purpose at all."). Accordingly, the Ninth Circuit had deviated from the deferential AEDPA standard when it reversed the state court's determination.

Nevertheless, Judge Clement's dissenting opinion, which relies on *Payton* to conclude that this court should defer to the Texas Court of Criminal Appeals's denial of habeas relief, fails to recognize that "[t]he [AEDPA] standard is demanding but not insatiable; . . . '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 2325 (2005) (third alteration in original) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). In contrast to the circumstances at issue in *Payton*, Nelson's mitigating evidence clearly has relevance beyond the issues of deliberateness and future dangerousness under *Penry I* and its progeny. If the jury concluded that Nelson was likely to be dangerous in the future based on his mental disorder and abusive childhood, but also concluded that this evidence rendered him less morally culpable, it had no way to give effect to the mitigating aspect of that evidence through the two special issues. *See Smith*, 543 U.S. at 38; *Tennard*, 542 U.S. at 288-89; *Penry II*, 532 U.S. at 803; *Penry I*, 492 U.S. at 323. Moreover, *Tennard* precludes a reviewing court from reweighing the evidence presented at trial to determine whether the alleged

52

mitigating circumstance is treatable and therefore transient. *Tennard*, 542 U.S. at 286-87. Thus, unlike the state court's determination in *Payton*, where the Supreme Court in *Boyde* had previously held that the challenged California instruction was broad enough to allow the jury to consider the impact of the mitigating evidence on the defendant's moral culpability, it was unreasonable for the Texas Court of Criminal Appeals in this case to conclude that Nelson's mitigating evidence was within the reach of the jury through the narrow special issues, given the law clearly established by the Supreme Court in *Penry I* and its progeny.

Finally, in support of its argument that evidence of a potentially treatable mental disorder should be analyzed similarly to the Court's consideration of youth, the State relies on Fifth Circuit case law that has erroneously interpreted *Penry* as requiring that the mitigating evidence be given only "some effect." Specifically, it relies on this court's opinion in *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998), in which the panel held that the special issues gave constitutionally sufficient effect to Lucas's evidence of schizophrenia coupled with a troubled upbringing. *See id.* at 1083 ("[The] prospect of medical treatment placed the evidence of his mental illness and abusive childhood within 'the effective reach of the sentencer' as a potential mitigating factor with respect to the second issue, that is, the

53

jury could have considered whether, in an institutional setting, the probability that Lucas posed as a future danger to society was not so great as to merit imposition of the death sentence."). In reaching this conclusion, *Lucas* cited the Supreme Court's decisions in *Johnson* and *Graham* for the proposition that "*Penry*'s application has since been limited to that narrow class of situations in which the petitioner's mitigating evidence was placed beyond the jury's effective reach," and that the evidence in that case was within the jury's effective reach, because the jury could have given it partial effect. *Id.* at 1082. As explained above, the Supreme Court has clearly held that the standard is full effect. Thus, continued reliance on the partial-effect methodology is erroneous, because that standard fails to take into account, as *Penry I* and its progeny require, a jury's inability to give mitigating effect to a defendant's *moral culpability* via the future-dangerousness issue. *See Smith*, 543 U.S. at 38; *Tennard*, 542 U.S. at 288-89; *Penry II*, 532 U.S. at 803; *Penry I*, 492 U.S. at 323. Moreover, and most importantly, AEDPA requires us to determine whether the state court unreasonably applied "clearly established federal law *as announced by the Supreme Court*," not by the Fifth Circuit. 28 U.S.C. § 2254(d)(1). Accordingly, to the extent that this court's cases have applied a less-than-full-effect standard to *Penry* claims in the past, i.e., to the extent that past cases failed to account for the jury's ability to give effect to the impact of mitigating

evidence on a defendant's moral culpability via the special issues, those cases were based on an erroneous interpretation of Supreme Court precedent. *See Smith*, 543 U.S. at 38 (holding that a sentencing scheme that fails to "give *full* consideration and *full* effect to mitigating circumstances in choosing the defendant's appropriate sentence" is "constitutionally inadequate" under *Penry I* and its progeny) (internal quotation marks and citations omitted).

### 3.   Sufficiency of Nelson's Mitigation Evidence

We also reject the argument that Nelson's evidence of borderline personality disorder is insufficient to warrant relief based on *Penry*. The Supreme Court has recognized that

> gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. *See Skipper* [*v. South Carolina*, 476 U.S. 1,] 7, n.2 ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating. For example, we have no quarrel with the statement . . . that 'how often [the defendant] will take a shower' is irrelevant to the sentencing determination[."].].

*Tennard*, 542 U.S. at 286-87. The *Tennard* Court was discussing evidence that had no probative worth in the jury's consideration of a defendant's moral culpability, not evidence that the jury may choose to believe or disbelieve. In contrast, the strength of Nelson's evidence of borderline personality disorder and abusive childhood "goes to the credibility of [Nelson's] mitigation

55

evidence, which should be judged by the jury in answering effective supplemental instructions addressing the mitigation evidence." *Blue v. Cockrell*, 298 F.3d 318, 322 (5th Cir. 2002), *abrogated on other grounds by Tennard*, 542 U.S. 274. Further, any argument that this court should dispose of Nelson's *Penry* claim on grounds that the evidence is insufficient endorses precisely the type of judicial evidence-weighing that the Court in *Tennard* expressly warned against:

> [T]o say that only those features and circumstances that a panel of federal appellate judges deems to be "severe" (let alone "uniquely severe") could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it "might serve 'as a basis for a sentence less than death,'" *Skipper*, [467 U.S.] at 5.

*Tennard*, 542 U.S. at 286-87. Nowhere does *Tennard* prescribe (or even allow for) a balancing test that weighs the strength of the mitigating evidence against that of the aggravating evidence. Such reasoning runs afoul of the low relevance standard that the Court emphasized in *Tennard*, i.e., *any tendency* to mitigate the defendant's culpability, and comes perilously close to applying a heightened-relevance test similar to the one that the Court struck down in *Tennard*. Accordingly, we also reject this argument.

**4.    Harmless Error**

56

Finally, we reject the State's argument that any *Penry* error in this case is subject to harmless-error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 622-23 (1993), which applies to error that is "amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" *Id.* at 629 (omission and alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). The State advances this harmless-error theory for the very first time on en banc rehearing in a discussion that consumes less than a page of its brief; it did not argue the applicability of harmless error before this court during Nelson's original habeas appeal, before the Supreme Court on certiorari review, or before this court when we initially reconsidered Nelson's habeas appeal on remand in light of *Tennard*. It was not until a concurring panel member in the most recent *Nelson* panel opinion suggested that *Brecht* might be applicable that the State argued harmless error in its en banc brief. The State's failure to argue this point prior to now is understandable because the Supreme Court has *never* applied a harmless-error analysis to a *Penry* claim or given any indication that harmless error might apply in its long line of post-*Furman* cases addressing the jury's ability to give full effect to a capital defendant's mitigating evidence. *See generally Tennard*, 542 U.S. 274; *Penry II*, 532 U.S. 782; *Penry I*, 492 U.S. 302; *Eddings*, 455 U.S. 104; *Lockett*, 438 U.S. 586.

57

Indeed, the *Penry II* Court applied the *Brecht* harmless-error test to Penry's claim that the prosecution's use of a psychiatrist's report violated his Fifth Amendment rights, *see Penry II*, 532 U.S. at 795. Conspicuously absent from the discussion regarding Penry's Eighth Amendment claim, however, is any mention of the harmless-error test in either the majority or the dissenting opinions.

Implicit in the Court's failure to apply harmless error in cases where the jury has been precluded from giving effect to a defendant's mitigating evidence is the recognition that a *Penry* error deprives the jury of a "vehicle for expressing its 'reasoned *moral* response to the defendant's background, character, and crime,'" which precludes it from making "'a reliable determination that death is the appropriate sentence.'" *Penry II*, 532 U.S. at 797 (quoting *Penry I*, 492 U.S. at 328, 319) (internal quotation marks omitted) (emphasis added). This reasoned *moral* judgment that a jury must make in determining whether death is the appropriate sentence differs from those fact-bound judgments made in response to the special issues. It also differs from those at issue in cases involving defective jury instructions in which the Court has found harmless-error review to be appropriate. *Cf. Neder v. United States*, 527 U.S. 1, 8-15 (1991) (applying harmless-error review where the jury instructions omitted an element of the offense, reasoning that, given the evidence presented, the verdict would have been the same had the jury been properly instructed); *Johnson*

58

*v. United States*, 520 U.S. 461, 468-69 (1997) (applying harmless-error review where the jury instructions omitted the materiality element of the perjury charge, noting that the error did not warrant correction in light of the "overwhelming" and "uncontroverted" evidence supporting materiality). Given that the entire premise of the *Penry* line of cases rests on the possibility that the jury's reasoned moral response might have been different from its answers to the special issues had it been able to fully consider and give effect to the defendant's mitigating evidence, it would be wholly inappropriate for an appellate court, in effect, to substitute its own moral judgment for the jury's in these cases. *See Tennard*, 542 U.S. at 286-87 ("[T]o say that only those features and circumstances that a panel of federal appellate judges deems to be 'severe' (let alone 'uniquely severe') could have such a tendency [to serve as a basis less than death] is incorrect. Rather, the question is simply whether the evidence is of such a character that it 'might serve "as a basis for a sentence less than death"' (quoting *Skipper*, 467 U.S. at 5)); *cf. Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (refusing to apply harmless error where the jury was improperly instructed on the burden of proof at the guilt/innocence phase, noting that "the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates all the jury's findings. A

reviewing court can only engage in pure speculation–its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty'" (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)).

Therefore, given the Supreme Court's refusal to allow an appellate court to substitute its own moral judgment for a moral judgment that the jury was unable to make in a *Penry* case, we decline to do so now.[8]

### III. CONCLUSION

At the time that Nelson's conviction became final, the Supreme Court had clearly established that the relevant inquiry is whether there was a reasonable likelihood that the jury would interpret the Texas special issues in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence. For the foregoing reasons, we conclude that there is a reasonable likelihood that the jury was precluded from giving full consideration and full effect to Nelson's mitigating evidence via the Texas special issues; therefore the state court's

---

[8]The State's reliance on *Calderon v. Coleman*, 525 U.S. 141 (1998), in support of its argument that the *Brecht* harmless-error test is applicable is misplaced. *Coleman* involved a jury instruction that gave the jury inaccurate information on the governor's power to commute a sentence, which the lower court found might have misled the jury and distracted it from the mitigating evidence presented. *Coleman* is not at all comparable to cases involving *Penry* violations, where the jury is *precluded* from giving its reasoned moral response to the defendant's mitigating evidence.

60

determination that the special issues were constitutional as applied to Nelson's case was unreasonable. Accordingly, we REVERSE the district court's denial of habeas relief and REMAND with instructions to grant the writ of habeas corpus.

DENNIS, CIRCUIT JUDGE, CONCURRING IN THE JUDGMENT AND ASSIGNING ADDITIONAL REASONS.

In this case we must decide whether petitioner, Billy Ray Nelson, was sentenced to death in violation of the Eighth Amendment because the jury was not instructed that it could consider and give effect to his mitigating evidence by deciding between the death penalty or a lesser sentence of life imprisonment. The three-judge panel of this court concluded that Nelson's death penalty must be affirmed, but its members did not agree upon a majority rationale or opinion. Chief Judge Jones issued an opinion concluding that the pre-1991 Texas capital sentencing statute as applied to Nelson's mitigating evidence and case did not violate the Eighth Amendment and affirming the district court's judgment denying Nelson's federal habeas corpus petition. I filed an opinion concurring in that result, concluding that, under the Supreme Court's decisions in Penry v. Lynaugh, 492 U.S. 302 (1989) ("Penry I") and other cases, because Nelson had introduced relevant mitigating evidence of impairment by mental disease, childhood abuse, and chemical abuse and dependency, the State's use of the pre-1991 Texas statutory scheme to sentence him to death violated his constitutional rights. However, I concluded that under the harmless error test of Brecht v. Abrahamson, 507 U.S. 619 (1993), the constitutional violation was harmless error. Judge Stewart also concurred in the result, but he did not join either opinion or assign reasons.

After rehearing the case en banc, the majority of this court has now decided that the application of the pre-1991 Texas statutory capital sentencing scheme to Nelson's case violated the Eighth Amendment and that this violation cannot be disregarded as harmless error.  I join fully in the majority's conclusions and agree substantially with its reasons.  The majority's analysis of Nelson's Penry I claim is similar to that set forth in my separate panel opinions here and in other cases.[1]  Accordingly, I join the majority's decision and assign additional reasons hereafter.

On the harmless error issue, I acknowledge my mistake at the panel level in undertaking a harmless error analysis of the constitutional defect in this case.  After considering the parties' briefs and conducting my own additional research, I now see that (1) the State waived its harmless error argument by not urging it prior to this en banc rehearing and (2) the constitutional deficiency in the capital sentencing  mechanism as applied to this case was a structural defect, not a mere constitutional trial error, and

---

[1]See, e.g., Cole v. Dretke, 443 F.3d 441, 442-51 (5th Cir. 2006) (Dennis, J., dissenting); Nelson v. Dretke, 442 F.3d 282, 288-309 (5th Cir. 2006) (Dennis, J., concurring in the judgment); Robertson v. Cockrell, 325 F.3d 243, 274-80 (5th Cir. 2003) (en banc) (Dennis, J., dissenting); Tennard v. Cockrell, 284 F.3d 591, 597-604 (5th Cir. 2002) (Dennis, J., dissenting); Penry v. Johnson, 215 F.3d 504, 513-16 (5th Cir. 2000) (Dennis, J., dissenting). I am grateful to my law clerks who worked with me on these opinions and especially to three, Kevin Kneupper, Jelani Jefferson, and Bradley Meissner, who helped in preparing this en banc concurring opinion.

therefore cannot be subjected to harmless error analysis.[2]  The

reasons for these conclusions are set forth in the final section of

this opinion.

1.    <u>The Eighth Amendment Requirement Of Individualized Sentencing
      Obliges States, Including Texas, To Enable Capital Sentencers
      To Select The Appropriate Penalty After Full Consideration Of
      The Defendant's Mitigation Evidence.</u>

The  Supreme  Court's  recognition  of  the  constitutional

requirements regarding individualized sentencing began in 1976, when

the  Court  issued  a  series  of  major  decisions  concerning  the

constitutionality of the death penalty that altered the fundamentals

of the Court's death penalty jurisprudence.[3]  These cases dealt with

death penalty statutes enacted by various states in response to the

Supreme Court's decision in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972),

which had previously invalidated the death penalty.  None of the

---

[2]In my dissent from a previous decision, I reached the same
conclusion with respect to the <u>Penry I</u> violation in that case,
<u>i.e.</u>, that it was a structural defect, not a trial error, and
therefore could not be subjected to harmless error analysis.  <u>See</u>
<u>Hernandez v. Johnson</u>, 248 F.3d 344, 378-81 (5th Cir. 2001) (Dennis,
J., dissenting).  Later, however, I became dissuaded of that view
by my imperfect understanding of the relationship between the
Supreme Court's decisions in <u>Johnson v. Texas</u>, 509 U.S. 350 (1993),
<u>Boyde v. California</u>, 494 U.S. 370 (1990), <u>Calderon v. Coleman</u>, 525
U.S. 141 (1998), and the Court's structural defect/harmless error
jurisprudence. After additional study and a better understanding of
these Supreme Court decisions, I have returned to my original view
that the type of constitutional violation here is a structural
defect, not a trial error.  I have set forth the reasons for my
error and the need for its correction in the last section of this
opinion dealing with the harmless error question.

[3]<u>See</u> <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976); <u>Proffitt v.</u>
<u>Florida</u>, 428 U.S. 242 (1976); <u>Jurek v. Texas</u>, 428 U.S. 262 (1976);
<u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976); <u>Roberts v.</u>
<u>Louisiana</u>, 428 U.S. 325 (1976).

five cases produced a majority opinion, but several major, enduring principles nevertheless emerged from these cases.  First, states cannot make the imposition of the death penalty mandatory from any class of crimes.  See Woodson, 428 U.S. at 302-305; Roberts, 428 U.S. at 335-36; see also Sumner v. Shuman, 483 U.S. 66, 74 (1987).  Second, state  death penalty statutes must limit and guide the sentencer's discretion to impose the death penalty in order to prevent its arbitrary and capricious application.  See, e.g., Johnson v. Texas, 509 U.S. 350, 360 (1993) ("In the five cases, the controlling joint opinion of three Justices reaffirmed the principle of Furman that 'discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'") (quoting Gregg, 428 U.S. at 189).  Third, the capital sentencer must be allowed to consider and give effect to the unique circumstances of the individual defendant and his particular crime when determining the appropriate sentence.  See, e.g., Shuman, 483 U.S. at 74 ("In the two cases striking down as unconstitutional mandatory capital-sentencing statutes, the opinions stressed that one of the fatal flaws in those sentencing procedures was their failure to permit presentation of mitigating circumstances for the consideration of the sentencing authority.").  These underlying principles have continued to guide the Supreme Court's death penalty jurisprudence.

Prior to Penry I, and certainly before Nelson's conviction became final in 1994, the relevant Supreme Court decisions had

clearly established the Eighth Amendment requirement of individualized sentencing in capital cases.  See, e.g., McCleskey v. Kemp, 481 U.S. 279, 303-04 (1987) (noting that "the Court has imposed a number of requirements on the capital sentencing process to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in Gregg" and stating that "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence"); Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."); Eddings v. Oklahoma, 455 U.S. 104,  113-14 (1982) (holding that the capital sentencer may not be prevented from considering any relevant mitigating evidence presented by the defendant); Bell v. Ohio, 438 U.S. 637, 642 (1978)  (plurality opinion) (same); Lockett v. Ohio, 438 U.S. 586, 604-05 (1978) (plurality opinion) (same).  That is, in order to constitutionally impose and carry out the death penalty, a capital sentencer must at least be enabled (although it need not be instructed) (1) to make an individualized assessment of the defendant's moral culpability and deathworthiness, based on a full consideration of each defendant's mitigating evidence, as well as the character and record of the individual offender and the circumstances of the particular offense; and (2) to give full effect

66

to that evidence by selecting the appropriate sentence, either life imprisonment or death, according to each defendant's level of moral culpability and deathworthiness.  See Cole, 443 F.3d at 443-44 (Dennis, J., dissenting); Nelson, 442 F.3d at 303-06 (Dennis, J., concurring in the judgment); Tennard, 284 F.3d at 599-601 (Dennis, J., dissenting).

Nor is the Eighth Amendment's concern with individual culpability limited to the selection phase;[4] rather, the principle that capital punishment must be reserved for the most culpable perpetrators of the most serious crimes "is implemented throughout the capital sentencing process." Roper v. Simmons, 543 U.S. 551, 568 (2005).  Indeed, the imperative that only the most culpable offenders be sentenced to death has also long animated the Court's decisions holding that certain classes of crimes and offenders are categorically ineligible for the death penalty, including persons under the age of 18 at the time of their crime, see id. at 569-75 (holding that reduced culpability of juveniles "demonstrate[s] that juvenile offenders cannot with reliability be classified among the worst offenders"); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 836-38 (1988) (plurality opinion) (prohibiting imposition of death

---

[4]In Tuilaepa v. California, 512 U.S. 967, 971-72 (1994), the Court recognized that there were two phases of the capital sentencing process:  the "eligibility decision," which serves to narrow the class of defendants eligible for the death penalty, and the "selection decision," "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence."

penalty for persons under 16 at the time of their crime; "The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult."); the mentally retarded, see Atkins v. Virginia, 536 U.S. 304 (2002) ("Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability."); persons convicted of raping an adult woman, see Coker v. Georgia, 433 U.S. 584, 598 (1977) ("Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life."); murderers whose killings do not involve an elevated level of moral depravity or any other aggravating circumstance, see Godfrey v. Georgia, 446 U.S. 420, 433 (1980) (plurality opinion) (reversing death sentence where "[t]he petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder"); and persons convicted of felony murder who lack a sufficiently culpable mental state, see Enmund v. Florida, 458 U.S. 782, 798 (1982) ("Enmund['s] . . . culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who

killed the Kerseys.  This was impermissible under the Eighth Amendment.").[5]

2.  <u>Penry I Recognized That The Eighth Amendment Requires A Capital Sentencing Jury To Have The Ability To Both Consider And Give Effect To All Relevant Mitigating Evidence In Choosing A Sentence</u>.

Given the pre-existing Eighth Amendment requirement that a capital sentencer must have individualized sentencing capability, it is not surprising that the Supreme Court in <u>Penry I</u> held that the Texas sentencing scheme was unconstitutional as applied when the Texas courts' reading of the statute did not permit the jury as sentencer to either assess the defendant's culpability or select the appropriate sentence.  Consistent with the well established individualized sentencing principles that it had held to be required by the Eighth Amendment, the Supreme Court in <u>Penry I</u> held:

> Underlying <u>Lockett</u> and <u>Eddings</u> is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an <u>individualized assessment of the appropriateness of the death penalty</u>, "evidence about the defendant's background and character is relevant . . . ." Moreover, <u>Eddings</u> makes clear that <u>it is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence</u>.  Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made <u>a reliable determination that death is the appropriate sentence</u>. "Thus, <u>the sentence imposed at the penalty stage should</u>

---

[5]<u>See also</u> <u>Tison v. Arizona</u>, 481 U.S. 137, 156-57 (1987) (clarifying scope of <u>Enmund</u>, and noting that "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime").

69

reflect a reasoned *moral* <u>response to the defendant's background, character, and crime</u>."

<u>Penry I</u>, 492 U.S. at 319 (italics in original) (emphasis added) (internal citations omitted). In <u>Penry I</u>, "[t]he State conceded at oral argument . . . that if a juror concluded that Penry acted deliberately and was likely to be dangerous in the future, but also concluded that because of his mental retardation he was not sufficiently culpable to deserve the death penalty, that juror would be unable to give effect to that mitigating evidence under the instructions given in this case." <u>Id.</u> at 326. Consequently, the Court held that "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty . . . <u>the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision</u>." <u>Id.</u> at 328 (emphasis added).

3. <u>The Supreme Court Has Consistently Reaffirmed Penry I's Holding That A Capital Sentencing Jury Must Be Able To Consider And Give Effect To All Relevant Mitigating Evidence In Selecting A Sentence.</u>

In its immediately following 1990 term, the Supreme Court repeatedly reaffirmed and applied the holding of <u>Penry I</u>, <u>i.e.</u>, that the Eighth Amendment requires that the capital sentencer be able to consider and give effect to all relevant mitigating evidence in selecting and imposing the appropriate life or death sentence. <u>See</u>

70

Boyde v. California, 494 U.S. 370, 377-78 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner.") (citing, inter alia, Penry I); McKoy v. North Carolina, 494 U.S. 433, 443 (1990) ("As the Court stated in [Penry I]: . . . . "'[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.' Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense.") (internal citation omitted); Saffle v. Parks, 494 U.S. 484, 491 (1990) ("In Penry, we held that resolution of a claim that the Texas death penalty scheme prevented the jury from considering and giving effect to certain types of mitigating evidence did not involve the creation of a new rule under Teague. See Penry, 492 U.S. at 315 []. To the extent that Penry's claim was that the Texas system prevented the jury from giving any mitigating effect to the evidence of his mental retardation and abuse in childhood, the decision that the claim did not require the creation of a new rule is not surprising. Lockett and Eddings command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision; Penry's contention was that Texas barred the jury from so acting."); Blystone v. Pennsylvania, 494 U.S. 299, 304-

71

05 (1990) ("Last Term, we elaborated on this principle, holding that 'the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.' Penry v. Lynaugh, 492 U.S. 302, 328[] (1989)").

Through the 1990s, the Court continued to ratify the Penry I requirement that the capital sentencing jury must able to consider and give effect to the defendant's relevant mitigating evidence in selecting and imposing the appropriate sentence. See Payne v. Tennessee, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances . . . .") (internal citations omitted); Buchanan v. Angelone, 522 U.S. 269, 276 (1998) ("In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. [citing Penry I, Eddings, and Lockett]. . . . Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.").

In Penry v. Johnson, 532 U.S. 782 (2001) ("Penry II"), the Supreme Court emphatically reaffirmed and applied the rule of Penry

72

I.   The Court held that in <u>Penry I</u> it had "confirm[ed] that in a capital case, '[t]he sentencer must . . . be able to consider and give effect to [mitigating] evidence in imposing sentence,' so that ''the sentence imposed . . . reflec[ts] a reasoned moral response to the defendant's background, character, and crime.''"  <u>Id.</u> at 788 (quoting <u>Penry I</u>, 492 U.S. at 319) (alterations in original).  The Court in <u>Penry II</u> made clear that a Texas court violates the rule of <u>Penry I</u> and the Eighth Amendment when it only allows the jury to use relevant mitigating evidence to answer the special issues without also allowing it to use such evidence to select the appropriate life or death sentence.  The <u>Penry II</u> Court explained "the key under <u>Penry I</u>" as follows:

> <u>Penry I</u> did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment.  Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence.  Rather, the key under <u>Penry I</u> is that the jury be able to "consider and <u>give effect</u> to [a defendant's mitigating] evidence in imposing sentence." 492 U.S., at 319, 109 S.Ct. 2934 (emphasis added). <u>See</u> <u>also</u> <u>Johnson v. Texas</u>, 509 U.S. 350, 381, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (O'CONNOR, J., dissenting) ("[A] sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances" (emphasis in original)).  For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," <u>Penry I</u>, 492 U.S., at 328, 109 S.Ct. 2934, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence," <u>id.</u>, at 319, 109 S.Ct. 2934 (quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)).

<u>Penry II</u>, 532 U.S. at 797.

73

Applying the rule of Penry I again, the Court in Penry II held that the pre-1991 Texas capital sentencing scheme was unconstitutional as applied in Penry's second capital sentencing for essentially the same reasons it was constitutionally defective the first time.  The state trial court had attempted to cure the constitutional deficiency with an ad hoc supplemental instruction, but that instruction did not pass muster under the rule of Penry I because it did not clearly inform the jurors that they were legally empowered to consider and give effect to Penry's mitigating evidence in selecting and imposing the appropriate life or death sentence. As the Penry II court stated, repeating the words of Penry I: "'[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence.'"  Id. at 804 (quoting Penry I, 492 U.S. at 326).

In 2004, the Supreme Court twice reaffirmed the rule of Penry I in Texas death penalty cases.  In Tennard v. Dretke, 542 U.S. 274 (2004), and Smith v. Texas, 543 U.S. 37 (2004), the Court confirmed Penry I's vitality and restated the rules governing its application. Tennard and Smith made plain that the inquiry that this court must undertake in a Penry case is simply to consider whether the defendant's evidence is relevant (i.e., whether it tends to prove or disprove any fact that the sentencer might deem mitigating), and, if so, determine whether the special issues inhibit the jury's ability to consider and give effect to that evidence.  Tennard and

74

<u>Smith</u> also clearly instructed both this court and the Texas courts to refrain from placing restrictive glosses on the Court's jurisprudence and creating unwarranted impediments to <u>Penry</u> claims.

In <u>Tennard</u>, the Court first summarized the rules of federal law it had recognized in <u>Penry I</u>, that: (1) the pre-1991 Texas capital sentencing scheme "provided a constitutionally inadequate vehicle for jurors to consider and give effect to the mitigating evidence of mental retardation and childhood abuse...." <u>Tennard</u>, 542 U.S. at 276; (2) "'it is not enough simply to allow the defendant to present mitigating evidence to the sentencer...'" but rather "'[t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence,'" <u>id.</u> at 278 (quoting <u>Penry I</u>, 492 U.S. at 319); (3) the "give effect to" language of <u>Penry I</u> was "the key" to that decision, <u>id.</u> at 278; (4) the same two special issues that were presented to Tennard's jury were "insufficient for the jury in Penry's case to consider and give effect to Penry's evidence of mental retardation and childhood abuse," <u>id.</u>; (5) Penry's mental retardation evidence "''had relevance to [his] moral culpability beyond the scope of the [deliberateness] special verdict questio[n]'' because '[p]ersonal culpability is not solely a function of a defendant's capacity to act 'deliberately,''" <u>id.</u> at 278-79 (quoting <u>Penry I</u>, 492 U.S. at 322) (alterations in original); (6) Penry's mental retardation evidence "was relevant to the future dangerousness special issue 'only as an <u>aggravating</u> factor,'" <u>id.</u>

75

at 279 (quoting Penry I, 492 U.S. at 323); and (7) "the two special issues simply failed to 'provide a vehicle for the jury to give [the evidence of childhood abuse] mitigating effect.'" Id. (quoting Penry I, 492 U.S. at 322-24).

The Tennard court next called upon us to comply with the rules of federal law it had established concerning the introduction and use by the sentencing body of a defendant's mitigating evidence in a capital case. It adduced its holding in McKoy that in capital cases the "meaning of relevance is no different in the context of mitigating evidence . . . than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — applies." Tennard, 542 U.S. at 284 (quoting McKoy, 494 U.S. at 440) (internal quotation marks omitted). Then, the Court in Tennard recognized the effects of its previous holdings regarding the relevance standard in capital cases. "Once this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." Id. at 285 (quoting Boyde, 494 U.S. at 377-78).

Further, the Court commented on and quoted from its opinion in Skipper v. South Carolina, 476 U.S. 1 (1986), regarding its rules about the introduction and use of relevant mitigating evidence. "We have never denied that gravity has a place in the relevance

76

analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." Tennard, 542 U.S. at 286 (citing Skipper, 476 U.S. at 7 n.2). "However, to say that only those features and circumstances that a panel of federal appellate judges deems to be 'severe' (let alone 'uniquely severe') could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it 'might serve 'as a basis for a sentence less than death.''" Id. at 287 (quoting Skipper, 476 U.S. at 5). The Tennard court also held that the Fifth Circuit had erred in creating and applying its own restrictive gloss—its "constitutional relevance" rule[6]—as a threshold screening test to truncate its judicial review, rather than applying the federal rules clearly established by the Court's decisions to the defendant's mitigating evidence and Penry claim. The Court disapproved of the "constitutional relevance" rule as "ha[ving] no foundation in the decisions of this Court. Neither Penry I nor its progeny screened mitigating evidence for 'constitutional relevance' before considering whether the jury instructions comported with the Eighth Amendment." Id. at 284.

---

[6]Under the Fifth Circuit's rule at that time, to be constitutionally relevant, the defendant's mitigating evidence had to show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, and (2) that the defendant's criminal act was attributable to that severe condition.

Finally, the Tennard court held that evidence of impaired intellectual functioning is obviously evidence under the clearly established relevance standard that "'might serve 'as a basis for a sentence less than death,''" id. at 287 (quoting Skipper, 476 U.S. at 5), and that "[t]he relationship between the special issues and Tennard's low IQ evidence has the same essential features as the relationship between the special issues and Penry's mental retardation evidence. Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately." Id. at 288 (citing Penry I, 492 U.S. at 322).

Justice O'Connor wrote the opinion for a six-member majority in Tennard, and was joined by Justices Stevens, Kennedy, Souter, Ginsburg and Breyer.

Shortly after Tennard, in Smith, the Supreme Court reiterated that the standard relevance test governs the admission and use of mitigating evidence in capital cases. The Smith court also reaffirmed the rule "that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a low threshold for relevance, which is satisfied by evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Smith, 543 U.S. at 44 (quoting Tennard, 542 U.S. at 284-85) (internal quotation marks omitted).

In <u>Smith</u>, the defendant had presented evidence that (1) he had potentially organic learning disabilities and speech handicaps; (2) he had a verbal IQ of 75, a full IQ of 78, and had been in special education classes in school; (3) his behavior at school was often exemplary, notwithstanding his low IQ and learning disabilities; (4) his father was a drug addict and violent criminal who regularly stole money from his family to support his drug addiction; and (5) he was only 19 years old at the time of his crime. <u>Id.</u> at 41. According to the <u>Smith</u> court, "[t]hat petitioner's evidence was relevant for mitigation purposes is plain under our precedents, even those predating <u>Tennard</u>." <u>Id.</u> at 45 (citing <u>Penry I</u>, 492 U.S. at 319-322, <u>Payne</u>, 501 U.S. at 822), <u>Boyde</u>, 494 U.S. at 377-78, and <u>Eddings</u>, 455 U.S. at 114). Having found the evidence relevant, the Court stated that "the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence." <u>Id.</u>; <u>see also</u> <u>id.</u> at 46 (noting that <u>Penry II</u> "held that 'the key under <u>Penry I</u> is that the jury be able to 'consider and *give effect* to [a defendant's mitigation] evidence in imposing sentence''") (quoting <u>Penry II</u>, 532 U.S. at 797).

Seven members of the Court joined the per curiam opinion in <u>Smith</u>, including Chief Justice Rehnquist and Justices O'Connor, Stevens, Kennedy, Souter, Ginsburg, and Breyer. Justice Scalia, joined by Justice Thomas, dissented, saying only that he would affirm the judgment of the Texas Court of Criminal Appeals and

adhering to his longstanding position in <u>Walton v. Arizona</u>, 497 U.S. 639, 673 (1990) (Scalia, J., concurring in part and concurring in the judgment), of not "vot[ing] to uphold an Eighth Amendment claim that the sentencer's discretion has been unlawfully restricted." See <u>Smith</u>, 543 U.S. at 49 (Scalia, J., dissenting).

Finally, in 2006, the Court again confirmed the <u>Penry I</u> rule requiring that a capital sentencing jury be able to consider and give effect to relevant mitigating evidence in the selection of the appropriate life or death sentence. See <u>Oregon v. Guzek</u>, 126 S. Ct. 1226, 1228 (2006) ("The Eighth Amendment insists upon ''reliability in the determination that death is the appropriate punishment in a specific case.'' The Eighth Amendment also insists that a sentencing jury be able 'to consider and give effect to mitigating evidence' about the defendant's 'character or record or the circumstances of the offense.'") (quoting <u>Penry I</u>, 492 U.S at 327-328) (internal citations omitted).

In sum, the Supreme Court has continued to reaffirm and apply the <u>Penry I</u> rule in many cases since its inception in 1989, has recognized its application to cases involving such relevant mitigating evidence as impaired intellectual function, low IQ, troubled and abusive childhood, participation in special education classes, and mental retardation, and has developed numerous auxiliary jurisprudential rules in support of the application of the <u>Penry I</u> rule.

4.  <u>The Court's Cases Demonstrate That Johnson Does Not Change or Limit The Penry I Rule; It Merely Establishes Auxiliary Principles Relating To Its Application</u>.

Contrary to the argument by the State and my dissenting colleagues, the Supreme Court in <u>Johnson</u> did not change or limit the <u>Penry I</u> rule that the Eighth Amendment requires that a capital sentencing jury must be able to give full consideration and effect to all of a defendant's relevant mitigating evidence in imposing the appropriate life or death sentence. In <u>Johnson</u>, the Court merely recognized three auxiliary principles for implementing the <u>Penry I</u> rule: (1) Because of the unique manner in which youth mitigation evidence aligns the inquiry into future dangerousness with an assessment of culpability or deathworthiness, a defendant's relevant mitigating evidence of youth may be given full consideration and effect by the jury's answer to the future dangerousness special issue; (2) In order to determine whether a <u>Penry</u> violation occurred, a reviewing court must ask whether there is a reasonable likelihood that the jury has applied the special issues in a way that prevents it from giving full consideration and effect to any relevant mitigating evidence; and (3) the state may shape and structure the jury's consideration so long as it does not preclude the jury from giving effect to any relevant mitigating evidence, because, as the Court subsequently explained, "[o]ur consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." <u>Buchanan v. Angelone</u>, 522 U.S. 269, 276 (1998).

81

That Johnson established these auxiliary principles and did not change or limit the rule of Penry I itself was most clearly demonstrated by the Court's decision in Buchanan. In that case, the Court held that the state trial court's refusal to give instructions on the concept of mitigation and on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments. Id. at 276-78. The Court explained that the defendant, in arguing to the contrary, misunderstood the significant distinction it had drawn between the two phases of the capital sentencing process: the eligibility phase, in which the jury narrows the class of defendants eligible for the death penalty, and the selection phase, with which Buchanan was concerned, in which the jury determines whether to impose a death sentence on an eligible defendant. Id. at 275-76 (citing Tuilaepa v. California, 512 U.S. 967, 971-972 (1994)). In explaining the eligibility and selection phases, the Court again ratified the Penry I rule and described the principles that had been generated by Johnson in terms that indicate the Court views them as supporting, rather than limiting, rules:

> In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. . . .
>
> . . . . It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an

82

individualized determination. <u>Tuilaepa</u>, <u>supra</u>, at 971-973, 114 S.Ct., at 2634-2636; <u>Romano v. Oklahoma</u>, 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); <u>McCleskey v. Kemp</u>, 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-1775, 95 L.Ed.2d 262 (1987); <u>Stephens</u>, supra, at 878-879, 103 S.Ct., at 2743-2744. . . .

<u>In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. Penry v. Lynaugh, 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256 (1989); Eddings v. Oklahoma, 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978). However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Johnson v. Texas, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); Penry, supra, at 326, 109 S.Ct., at 2951; Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence</u>.

<u>Id.</u> at 275-76 (emphasis added).

Thus, as the <u>Buchanan</u> Court read <u>Penry I</u> together with <u>Johnson</u>, <u>Tuilaepa</u>, <u>Romano</u> and other cases, the rule of <u>Penry I</u> is not limited by <u>Johnson</u> at all. Instead, the <u>Penry I</u> holding that the Eighth Amendment requires that a capital sentencing jury be able to consider fully and give effect to the defendant's relevant mitigating evidence by selecting the appropriate sentence stands unlimited and unscathed by <u>Johnson</u>. <u>Johnson</u>, as read by <u>Buchanan</u>, merely establishes precedent for application of the <u>Boyde</u> test and adds that a State may shape and structure mitigation consideration

83

so long as it does not prevent the sentencer from giving effect to the mitigating evidence.

Moreover, as pointed out earlier, since Johnson was decided, the Court in Penry II, Tennard, and Smith repeatedly reaffirmed the rule and holding of Penry I as Justice O'Connor described it, first, in Penry I itself, next, in her dissent in Johnson, again in the six-member majority of Penry II, and finally in Tennard. In her Johnson dissent, Justice O'Connor stated:

> [In Penry I],we plainly held that the Texas special issues violated the Eighth Amendment to the extent they prevented the jury from giving full consideration and effect to a defendant's relevant mitigating evidence.
>
> Penry was in no way limited to evidence that is only aggravating under the "future dangerousness" issue. We stated there that "Eddings makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." That we meant "full effect" is evident from the remainder of our discussion. We first determined that Penry's evidence of mental retardation and his abused childhood was relevant to the question whether he acted deliberately under the first special issue. But having some relevance to an issue was not sufficient, and the problem was not, as the Court today suggests, simply that no jury instruction defined the term "deliberately." Instead, we noted that the jury must be able to give effect to the evidence as it related to Penry's "[p]ersonal culpability," which "is not solely a function of a defendant's capacity to act 'deliberately.'" The jury could not give full effect to Penry's evidence under the first special issue because "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." That is, the evidence had relevance beyond the scope of the first issue.

84

<u>Johnson</u>, 509 U.S. at 385-86 (O'Connor, J., dissenting) (alteration in original) (internal citations omitted).

Significantly, too, Justice Kennedy, <u>Johnson</u>'s author, joined the six member majorities in <u>Penry II</u> and <u>Tennard</u>, and the seven member majority in <u>Smith</u>. Further, <u>Tennard</u> and <u>Smith</u> made clear that the rule of <u>Penry I</u> applies to all categories of mitigating evidence that are relevant to the assessment of a defendant's diminished culpability or that might cause a jury through its reasoned moral response to select life imprisonment rather than a death sentence for the defendant. These decisions, along with <u>Buchanan</u>, have resoundingly ratified and continued to uphold Justice O'Connor's view as expressed in <u>Penry I</u> that the Eighth Amendment requires that a capital sentencing jury be able to fully consider defendant's relevant mitigating evidence by using that evidence to assess his moral culpability and to give full effect to that evidence by selecting the appropriate life or death sentence for him in that case.

Also, as the Court has made clear in <u>Buchanan</u>, <u>Tennard</u>, <u>Smith</u>, and other cases, the State's ability to shape and structure the capital sentencer's consideration of mitigation evidence may not be used to "preclude the jury from giving effect to any relevant mitigating evidence" by selecting the appropriate sentence for the offender in each case. <u>Buchanan</u>, 522 U.S. at 276. The Court emphasized its continued disapproval of the use of the Texas special issues to in any way "constrain" the jury's ability to give effect

85

to mitigation evidence by selecting the appropriate sentence. In comparing the Virginia sentencing system involved in <u>Buchanan</u> with the Texas system used in <u>Penry I</u>, the Court stated:

> The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they "may fix" the penalty at death, but directed that if they believed that all the evidence justified a lesser sentence then they "shall" impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved. Moreover, in contrast to the Texas special issues scheme in question in <u>Penry</u>, the instructions here did not constrain the manner in which the jury was able to give effect to mitigation.

<u>Id.</u> at 277 (internal citation and footnote omitted).

Furthermore, as described earlier, the Court in <u>Tennard</u> and <u>Smith</u> emphatically held that state and inferior federal courts may not through judicial glosses or otherwise create ad hoc or common law type threshold or screening rules that cut short appellate review of death penalty cases and thus indirectly have the effect of approving and encouraging constraints upon the manner in which the capital sentencing juries are able to give full effect to relevant mitigating evidence in the selection of the appropriate death or life imprisonment sentence in individual cases.

The reaffirmation of <u>Penry I</u>'s rule that the capital sentencing jury be able to give both full consideration and full effect to relevant mitigating evidence, moreover, necessitates realigning the <u>Boyde</u> test analogue for application to the present case in which, allegedly, the capital sentencer was incapable of either appropriately considering or giving effect to the defendant's

86

mitigating evidence for the purposes of individualized sentencing. Due to the marked differences between the Texas sentencing system in the present case and the California system in <u>Boyde</u>, the <u>Boyde</u> rule cannot be applied in precisely the same way to the alleged dual error in the present case.

In <u>Boyde</u>, although the jury was instructed that it must impose the death penalty if it found the aggravating circumstances to outweigh the mitigating circumstances and a life imprisonment sentence if it found vice versa, the jurors retained a great deal of discretion in that they could decide what weight to assign the aggravating and mitigating factors and they were fully enabled to make the ultimate choice of whether to impose or withhold the death penalty. Thus, the California system in <u>Boyde</u> was markedly different from the pre-1991 Texas system under which the jury was not legally authorized to choose between life and death sentences in any case. In <u>Boyde</u>, the defendant argued that although the jury retained significant sentencing discretion, his constitutional rights were violated because the jury was given an instruction that could have misled it into thinking it was not free to consider his mitigating evidence of background and character in deciding whether to impose the death penalty. Near the beginning of the Supreme Court opinion, Chief Justice Rehnquist reaffirmed the rule of <u>Penry I</u>: "The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." <u>Boyde</u>, 494 U.S. at 378. However, after that point the

Boyde opinion does not refer to the "give effect" part of the rule as it was not genuinely at issue, the only real question being whether the allegedly ambiguous jury instruction had prevented the jury from "be[ing] able to consider . . . all relevant mitigating evidence." Id. The Court decided that the rule to be applied to such an alleged ambiguous jury instruction would be the "reasonable likelihood" test and, upon applying that test, concluded that there was no reasonable likelihood that Boyde's jury had been precluded from considering the relevant background and character mitigation evidence. As Chief Justice Rehnquist explained:

> In this case we are presented with a single jury instruction. The instruction is not concededly erroneous, nor found so by a court, as was the case in Stromberg v. Cailfornia, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction.

Id. at 380.

Because the capital sentencing jury in the present case, like the jury in Penry I, was not free or able to choose a life imprisonment sentence for Nelson, the alleged constitutional deficiency here

88

affected the jury's ability to both "consider and give effect" to Nelson's relevant mitigating evidence; it is not merely an alleged ambiguous jury instruction that could have affected only their understanding of the types of mitigating evidence that they could consider. Indeed, as I explain in the last section of this opinion, the constitutional deficiency here is a structural defect which affected the entire capital sentencing proceeding and cannot be analyzed for harmless error, i.e., the alleged binary defect is (1) the total absence of the jury's ability to consider the mitigating evidence for purposes of assessing Nelson's moral culpability or deathworthiness; and (2) the total absence of the jury's ability to give the evidence effect by selecting the sentence it deems appropriate based on that assessment. Accordingly, if the Boyde test is to be applied by analogy in the present case, it must be adjusted to properly and completely fit both elements of the alleged constitutional violation here. Because, unlike the situation in Boyde, there is a serious question here whether the jury was precluded from giving effect to Nelson's mitigating evidence, the proper inquiry here should be whether there is a reasonable likelihood that the jury was prevented from considering Nelson's mitigation evidence to assess his culpability or giving effect to that evidence by selecting the appropriate sentence.

Because of the unique nature of the youth mitigation evidence at issue in Johnson, the Court there apparently considered that only an alleged failure in the jury's ability to consider the evidence

89

was at issue.  The Court in Johnson must have concluded that the jury was fully capable of giving effect to the mitigating evidence by selecting the sentence if the jury instruction had not precluded them from giving it full consideration.  Thus, the situations posing only unitary errors in both Boyde and Johnson were quite similar in this respect despite other differences in the two sentencing systems. Consequently, there was no need for the Court to consider further reshaping the Boyde test analogue that it derived from its Boyde decision.  For all of these reasons, the Johnson Court's use of a Boyde test analogue capable of testing only for a preclusion of the jury's ability to consider the evidence should not prevent courts from reshaping the analogue test to make it suitable for detecting a preclusion of both the jury's ability to  consider and to give effect to relevant mitigating evidence.

Considering all of the foregoing reasons, I conclude that the Court's decisions subsequent to Johnson demonstrate that neither it nor any other decision has been read as limiting or changing the constitutional requirements and principles established in Penry I.

5.    Texas' Pre-1991 Capital Sentencing Scheme Provided a Constitutionally Inadequate Vehicle for Jurors to Consider and Give Effect to the Mitigating Evidence that Nelson Presented.

As I explained above, by the time Nelson's conviction became final in 1994, the relevant Supreme Court cases had clearly established that in order to constitutionally impose and carry out the death penalty, a capital sentencer must be enabled:  (1) to make an individualized assessment of each defendant's moral culpability

90

and deathworthiness and (2) to give full effect to that evidence by selecting between either life imprisonment or death as the appropriate sentence.

In this case, Nelson presented evidence during the punishment phase of his trial that (1) he was rejected by his mother; (2) he abused drugs and alcohol; (3) he had troubled relationships with his brother and with women; (4) he had fathered a child, with whom he was not allowed to have a relationship; and (5) he suffered from borderline personality disorder. The state courts held that all of Nelson's evidence could be adequately considered within the "deliberateness" and "future dangerousness" special issues.

It is abundantly clear that there is more than a reasonable likelihood that the jury was not permitted to fully consider and give effect to Nelson's mitigating evidence, as the "deliberateness" and "future dangerousness" special issues did not permit the jury to consider how that evidence affected their assessment of Nelson's moral culpability or to agree upon whether the death penalty or life imprisonment was the appropriate sentence in his case. There can be no question that Nelson's mitigating evidence, particularly his evidence of a frequently disorienting borderline personality disorder, a medically recognized mental illness,[7] implicates his

_____

[7]Nelson's expert psychiatric witness, Dr. Hickman, testified that his borderline personality disorder caused him to experience sudden, violent outbursts of emotion that clouded his judgment. See See Nelson v. Dretke, 442 F.3d 282, 310-11 (5th Cir. 2006) (Dennis, J., concurring in the judgment) (describing testimony about Nelson's psychological condition in detail).  The fourth

91

deathworthiness and his moral culpability. Nelson's troubled background and mental disorder make him less morally culpable independently of the issues of whether he acted deliberately or would be a future danger. But "because the jury was only called upon to answer two relatively simple yes or no questions, there is no reason to suppose that it could or would consider the evidence for the complex purpose of assessing the comparative level of Nelson's culpability." Nelson, 442 F.3d at 306 (Dennis, J., concurring in the judgment). Accordingly, for the reasons set forth in my concurring panel opinion, I agree with the en banc majority that a Penry violation occurred in this case and that the state courts unreasonably applied clearly established federal law in denying Nelson's claim.

6. The Restrictive Glosses Applied At The Panel Level In This Case And Others Have No Basis In The Supreme Court's Decisions.

---

edition of the Diagnostic and Statistical Manual of Mental Disorders defines Borderline Personality Disorder as "[a] pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity by early adulthood and present in a variety of contexts," marked by five or more of the following: (1) "frantic efforts to avoid real or imagined abandonment"; (2) "a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation"; (3) "identity disturbance: markedly and persistently unstable self-image or sense of self"; (4) "impulsivity in at least two areas that are potentially self-damaging"; (5) "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior"; (6) "affective instability due to a marked reactivity of mood"; (7) "chronic feelings of emptiness"; (8) "inappropriate, intense anger or difficulty controlling anger"; and (9) "transient, stress-related paranoid ideation or severe dissociative symptoms." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 709 (4th ed., text. rev., 2000).

As the Supreme Court made unmistakably clear in Tennard, this court is not permitted to artificially or ingeniously narrow Penry I by imposing screening tests or placing restrictive glosses on the Supreme Court's jurisprudence. Tennard, 542 U.S. at 283-84; see also Smith, 543 U.S. at 43-45. In Tennard, the Court admonished this circuit that its "constitutional relevance," "uniquely severe permanent handicap," and "nexus" tests were restrictive glosses that had "no foundation in the decisions" of the Supreme Court. Tennard, 542 U.S. at 284, 289. As Tennard instructed, we are not permitted to alter or elaborate the tests outlined by the Supreme Court so as to "fail to reach the heart of [a defendant's] Penry claims." Id. at 286.

In holding that Nelson's mitigating evidence could be considered within the context of the special issues, the state court and Chief Judge Jones' panel opinion in this case erroneously relied on pre-Tennard Fifth Circuit precedent that, like the defunct "constitutional relevance" test, are unsupported by the Supreme Court's cases. The state court and Chief Judge Jones' panel opinion used such cases to find that both Nelson's evidence concerning his background and troubled relationships and his evidence of voluntary intoxication could be sufficiently considered within the scope of the special issues. See Nelson, 442 F.3d at 285-86. In light of the clearly established law described above, however, it was error to rely on prior Fifth Circuit threshold and screening rules in those cases.

93

Even more troubling is Chief Judge Jones' panel opinion's resort to yet another of this circuit's restrictive glosses on the Supreme Court's Penry jurisprudence, in the form of the "treatable mental disorder" test, under which evidence of a mental disorder that is only theoretically treatable is not considered Penry evidence. Nelson, 442 F.3d at 287 (citing Coble v. Dretke, 417 F.3d 508 (5th Cir. 2005)). Again, this test adds a gloss that has no basis in the Supreme Court's decisions. This circuit's rule that any theoretically non-permanent mental illness can be given the requisite effect through the Texas special issues is simply another contrivance to avoid the requirements of the Supreme Court's individualized sentencing jurisprudence, and I agree with the majority that it should not be applied.[8]

In addition, I agree with the majority's decision to reject the wholly-unfounded "double-edged" evidence rule. This court has sometimes used Johnson to deny Penry claims by stating that Johnson adopted a so-called "double-edged" evidence rule, under which mitigating evidence does not trigger Penry scrutiny unless a juror considering the evidence could give it only aggravating, and not mitigating, effect under the special issues. See, e.g., Cole v. Dretke, 418 F.3d 494, 505-08 & n.54 (5th Cir. 2005), cert. granted sub nom., Abdul-Kabir v. Quarterman, 127 S. Ct. 432 (2006). As the

---

[8]The Supreme Court recently granted certiorari in a case involving this rule. See Brewer v. Dretke, 442 F.3d 273, 280 (5th Cir.) (stating that non-permanent mental illness does not give rise to a Penry claim), cert. granted, 127 S. Ct. 433 (2006).

94

majority points out, although the <u>Penry I</u> court remarked that one of the problems with the application of the special issues to Penry's case was that a juror could only find Penry's evidence of mental retardation to be an aggravating factor, <u>see</u> <u>Penry I</u>, 492 U.S. at 324, that observation was not the basis for the decision and <u>Penry I</u> is not therefore limited to such "double-edged" evidence. Moreover, as I explained in my dissent from the denial of rehearing en banc in <u>Cole</u>, nothing in the Court's decision in <u>Johnson</u> or subsequent cases indicates that the <u>Johnson</u> court adopted such a rule.  <u>See</u> <u>Cole</u>, 443 F.3d at 450-51 (Dennis, J., dissenting).

7.  <u>The State's Failure To Enable Its Capital Sentencing Jury To Give Full Consideration And Effect To Nelson's Relevant Mitigating Evidence Cannot Be Harmless Error.</u>

    i.  <u>The State Waived Its Harmless Error Argument.</u>

The state did not argue that any <u>Penry</u> error in this case could be harmless until its en banc brief in this court.  Ordinarily, the state bears the burden of showing that a preserved error was harmless.  <u>See</u> <u>United States v. Dominguez Benitez</u>, 542 U.S. 74, 81 n.7 (2004).  In addition, the state can waive harmless error review by failing to raise the issue in a timely and unequivocal manner in the district court.  <u>See</u> <u>Sanders v. Cotton</u>, 398 F.3d 572, 582 (7th Cir. 2005); <u>Lam v. Kelchner</u>, 304 F.3d 256, 269-70 (3d Cir. 2002); 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 31.2, at 1512 & n.1 (5th ed. 2005); <u>see also</u> <u>Saldano v. Roach</u>, 363 F.3d 545, 554-55 (5th Cir. 2004).  Although a court retains the discretion to consider the harmless error issue even when it has

95

been waived, it should generally do so only if the error's harmlessness is clear from even a cursory review of the record and reversal for further proceedings would be nothing more than a waste of resources. See Sanders, 398 F.3d at 582; United States v. Giovannetti, 928 F.2d 225, 226-27 (7th Cir. 1991). Whether the court should overlook the state's waiver of harmless error in any particular case depends on "the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court." Giovannetti, 928 F.2d at 227.

Although I did not consider the effect of the state's failure to raise harmless error in my concurring panel opinion, I am now convinced that the state waived any argument concerning harmless error by failing to raise it in the district court. Moreover, applying the factors set out in Giovannetti, it is clear that this is not a case in which we should exercise our discretion to overlook that waiver. The record in Nelson's case is substantial and the issues are complex; it is certainly debatable whether the trial court's error is, or could ever be, harmless (indeed, I conclude below that such an error is reversible per se); and reversing Nelson's death sentence and ordering a new sentencing proceeding at which the jury is permitted to fully consider Nelson's mitigating evidence in determining the appropriate sentence cannot be considered a futile act. Accordingly, this court can properly

96

conclude that the state has waived harmless error review and that this is not an appropriate case in which this court should disregard the state's waiver.

    ii.   <u>A Penry Error Is A Structural Defect That Is Not Susceptible To Harmless Error Review.</u>

Under principles of law clearly established by the Supreme Court's decisions, the constitutional violation in this case was a "structural defect" that cannot be analyzed as harmless "trial error." This is because the violation was not a discrete error that a reviewing court can determine from the record had no substantial and injurious effect or influence on the jury's determination of the sentence. Rather, the violation was the State's failure in this case to enable its capital sentencing jury to give full effect to Nelson's relevant mitigating evidence in determining the sentence.

The history and purpose of harmless error review demonstrates why it is inappropriate in this case. The dichotomy between errors of constitutional dimension that may be found to be harmless and those that may not began with <u>Chapman v. California</u>, 386 U.S. 18 (1967). In <u>Chapman</u>, the Supreme Court recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error...." <u>Id.</u> at 23. The Court pointed to the rule against coerced confessions,[9] the

---

    [9]<u>Id.</u> at 23 n.8 (citing <u>Payne v. Arkansas</u>, 356 U.S. 560 (1958)).

right to counsel,[10] the right to an impartial judge,[11] and, in a later case, the rule against double jeopardy,[12] as belonging to the list of constitutional rights so important that their violation requires automatic reversal.  See 3B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 855 (3d ed. 2004).  For errors that could be treated as harmless, Chapman established that the prosecution has the burden of showing that the error was harmless, and reversal is required unless the court is "able to declare a belief that it was harmless beyond a reasonable doubt."  Chapman, 386 U.S. at 24.  The Chapman court warned against "'overemphasis' on the notion that error is harmless if there is overwhelming evidence of guilt."  3B WRIGHT ET AL., supra, at § 855.  Later, in Bumper v. North Carolina, 391 U.S. 543, 550 n.16 (1968), the Court struck a similar chord, emphasizing that "it is not the function of this Court to determine innocence or guilt, much less to apply our own subjective notions of justice. Our duty is to uphold the Constitution of the United States."

Some twenty-four years after Chapman, building on the dichotomy it recognized, the Court in Arizona v. Fulminante, 499 U.S. 279 (1991), developed a theory for distinguishing between constitutional "trial errors," which can be harmless, and constitutional

---

[10]Id. (citing Gideon v. Wainwright, 372 U.S. 335 (1963)).

[11]Id. (citing Tumey v. Ohio, 273 U.S. 510 (1927)).

[12]Price v. Georgia, 398 U.S. 323 (1970).

"structural defects," which cannot.  The Court explained that trial error "occur[s] during the presentation of the case to the jury" and is amenable to harmless error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."  Id. at 307-08.  At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards.  The entire conduct of the trial from beginning to end is obviously affected by [structural defects such as] the absence of counsel for a criminal defendant [and] the presence on the bench of a judge who is not impartial."  Id. at 309-10.  The existence of a structural defect "affect[s] the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself."  Id. at 310.  A structural defect "transcends the criminal process" because "'[w]ithout these basic protections, a criminal trial cannot reliably serve its function . . . and no criminal punishment may be regarded as fundamentally fair.'"  Id. at 310, 311 (quoting Rose v. Clark, 478 U.S. 570, 577-78 (1986)).

In Fulminante, the Court also recognized that since Chapman it had added to the category of structural constitutional errors not subject to harmless error the following: "unlawful exclusion of members of the defendant's race from a grand jury;"[13] "the right to

---

[13]Id. at 310 (citing Vasquez v. Hillery, 474 U.S. 254 (1986)).

self-representation at trial;"[14] and "the right to public trial."[15] In <u>Fulminante</u> itself, the Court held that the admission of a coerced confession is a trial error subject to harmless error analysis, reversing its prior classification in <u>Chapman</u> of that kind of error as a structural defect.  Ultimately, however, a majority of the <u>Fulminante</u> court held that the error was not harmless beyond a reasonable doubt in that particular case and affirmed the Arizona Supreme Court's decision to grant Fulminante a new trial.  <u>Id.</u> at 297-302.

Two years later, the Supreme Court in <u>Sullivan v. Louisiana</u>, 508 U.S. 275 (1993), a case on direct review, held that a constitutionally deficient reasonable doubt jury instruction, which carries with it "consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as a structural error." <u>Id.</u> at 282 (internal quotation marks omitted).  As Justice Scalia explained, the harmless error question <u>Chapman</u> poses for reviewing courts is

> not what effect the constitutional error might generally
> be expected to have upon a reasonable jury, but rather
> what effect it had upon the guilty verdict in the case at

---

[14]<u>Id.</u> (citing <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 177-78 n.8 (1984)).

[15]<u>Id.</u> (citing <u>Waller v. Georgia</u>, 467 U.S. 39, 49 n.9 (1984)). In addition to these categories, commentators have pointed to a number of rights that have been designated as "structural" by the Court and various lower courts, including the the right to a speedy trial, a public trial, and the right to an appeal. <u>See</u> 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 31.3, at 1521-30 (5th ed. 2005).

hand. Harmless-error review looks . . . to the basis on which the jury actually rested its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

Id. at 279 (internal citations and quotation marks omitted). And, as he elaborated,

Since, for the reasons [just] described . . . , there has been no jury verdict within the meaning of the Sixth Amendment, the entire premise of Chapman review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.

Id. at 280 (internal citations omitted).

Also in 1993, the Supreme Court in Brecht changed the harmless error rule that applies to habeas corpus cases, holding that, on collateral review of state court decisions, federal courts should apply the standard of the Kotteakos v. United States, 328 U.S. 750 (1946), which asks whether the error had a substantial and injurious effect on the verdict, rather than the Chapman harmless beyond a

101

reasonable doubt standard, to decide whether a constitutional trial error was harmless. But the Brecht court did not alter, and in fact reaffirmed as longstanding, the rule that a constitutional structural defect is reversible per se and not subject to harmless error analysis. Citing Fulminante, the Court reiterated:

> Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." The existence of such defects-deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process. Since our landmark decision in Chapman v. California, we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type.

Id. at 629-30 (alterations in original) (internal citations omitted).

Accordingly, in habeas corpus proceedings, even after Brecht, "structural" constitutional defects, as opposed to constitutional "trial errors," are always considered "prejudicial" and reversible per se. Reviewing courts may not subject them to harmless error analysis or declare them to be harmless under any standard.

Applying the foregoing principles, I conclude that the constitutional violation that occurred when the pre-1991 Texas capital sentencing system was applied to a case in which a defendant had introduced mitigating evidence that reasonably may have caused a sentencer to impose a sentence of less than death, the violation

102

was caused not by a "trial error" but by a "structural defect" that is not subject to harmless error analysis.

More specifically, the defect plainly is not a "trial error," which "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis. Fulminante, 499 U.S. at 307. As Chief Justice Rehnquist explained in Fulminante, a "trial error" is one which "may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Fulminante, 499 U.S. at 307-08. Under his analysis, a Penry I violation is not a "trial error" because it is impossible for a reviewing court to "quantitatively" assess what affect the mitigating evidence would have had on the sentencing jury if it had been granted the discretion to choose between a life or a death sentence for Penry. Instead, the defect is a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards. The entire conduct of the [sentencing] from beginning to end is obviously affected by" a structural defect in the sentencing framework. Id. at 309-10. Consequently, Penry I held that the pre-1991 Texas capital sentencing scheme was unconstitutional as applied to that case and made clear that in a new capital sentencing proceeding the structural defect must be repaired so as to enable the jury to fully consider Penry's mitigation evidence and to decline to impose the death penalty if it decided that sentence to be inappropriate in Penry's case.

103

That the constitutional violation in <u>Penry I</u> and this case resulted from a "structural defect" that is not susceptible to harmless error analysis is even more clearly shown by applying Justice Scalia's first analysis in <u>Sullivan</u>. According to <u>Sullivan</u>, as a court reviewing for harmless error, we are instructed to consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the . . . verdict in the case at hand. . . . The inquiry, in other words, is not whether, in a [sentencing proceeding] that occurred without the error, a [death penalty] would surely have been [imposed], but whether the [death penalty actually imposed] in <u>this</u> [capital sentencing proceeding] was surely unattributable to the error." <u>Sullivan</u>, 508 U.S. at 279. Once the proper function of harmless error review is understood, "the illogic of harmless-error review in the present case becomes evident." <u>Id.</u> at 280. Since there has been no jury consideration of Nelson's mitigating evidence for purposes of determining whether the death penalty is necessary for just retribution in his case, and no jury decision that the death penalty is indeed appropriate in his case, "the entire premise of [harmless error] review is simply absent." <u>Id.</u> Because the jury could not fully consider the mitigating evidence and there was no jury decision upon whether the death penalty is appropriate here, the question of whether the same decision to impose the death penalty "would have been rendered absent the constitutional error is utterly meaningless." <u>Id.</u> "The

104

most [we] can conclude is that a jury <u>would surely have found</u>" that Nelson deserves the death penalty—not that the actual imposition of the death penalty "<u>would surely not have been different absent the constitutional error</u>." <u>Id.</u> Such a determination on our part in the present case would be nothing more than appellate speculation about a hypothetical jury's action, not a meaningful appellate harmless error analysis of Nelson's jury's actual determination to impose the death penalty.[16]

Having reached the foregoing conclusions after additional study and a better understanding of the applicable legal principles, I must acknowledge and correct the errors in the premise and the result of my separate panel opinion in this case.

My initial error resulted from my faulty appreciation of the correlation between (1) the Supreme Court's statement in <u>Johnson</u> that "[t]he standard against which we assess whether jury instructions satisfy the rule of <u>Lockett</u> and <u>Eddings</u> was set forth in <u>Boyde v. California</u>." <u>Johnson</u>, 509 U.S. at 367; (2) the Court's application by analogy of the <u>Boyde</u> test in <u>Johnson</u> to determine

---

[16]I am aware, of course, that Justice Scalia's <u>Sullivan</u> analysis is based on the Sixth Amendment, while a <u>Penry</u> violation is based upon an Eighth Amendment defect in the framework of a capital sentencing proceeding. Nevertheless, I believe that the teachings of <u>Sullivan</u> are helpful and directly applicable to the question of whether a <u>Penry</u> error is a structural defect not subject to harmless error analysis. As <u>Sullivan</u> acknowledges, its analysis is also fully consistent with Chief Justice Rehnquist's more general analysis for determining whether a constitutional violation is a structural defect or a trial error in <u>Fulminante</u>, which is not tied to the Sixth Amendment or to any other specific constitutional amendment. <u>See</u> <u>Sullivan</u>, 508 U.S. at 281-82.

whether there was a Penry I constitutional violation; and (3) the Court's holding in Calderon v. Coleman, 525 U.S. 141 (1998), that once the court of appeals had determined that the state trial court's ambiguous jury instruction was a constitutional trial error under the Boyde test, it was bound to apply the harmless error analysis mandated by Brecht and find the error harmful before issuing a writ of habeas corpus. From these decisions, I incorrectly concluded that every Penry I constitutional violation detected by application of the Boyde test will be a "trial error" susceptible to harmless error analysis. This does not follow, however; on the contrary, it seems probable that most Penry I violations will be structural defects that are reversible per se, like the defect in the present case. By its nature a Penry I violation consists of the absence of the jury's constitutionally required capability to consider and give effect to relevant mitigating evidence. Therefore, I conclude that after detecting a constitutional error by application of the Boyde test, it is necessary for us to analyze the particular constitutional deficiency according to the Supreme Court's jurisprudential principles to determine if it is a structural defect which is reversible per se or a trial error that is susceptible to harmless error analysis under Brecht.

Second, having erroneously concluded that a harmless error analysis could be performed on the structural defect in this case, I unintentionally compounded my mistake by attempting to apply the

106

Brecht test "to the hypothesizing of events that never in fact occurred. Such an enterprise is not factfinding, but closer to divination." Dominguez Benitez, 542 U.S. at 86 (2004) (Scalia, J., concurring). In other words, I could not examine the jury's decision choosing the sentence in this case, because the jury here never made such a decision. Instead, I erroneously performed what I thought was a proper harmless error examination but which in reality was an improper hypothesization of what the jury would have done had it been enabled to give effect to the mitigating evidence by selecting the sentence.

For these reasons, the deprivation of the defendant's right to a sentencing jury that was able to consider and give effect to all of his relevant mitigating evidence by selecting the appropriate sentence for him in the particular case, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural defect", not a "trial error."

## Conclusion

For these reasons, I concur in the judgment of the majority opinion.

EDITH H. JONES, Chief Judge, with whom JOLLY, SMITH, BARKSDALE, GARZA, and CLEMENT, Circuit Judges, join dissenting from the majority opinion:

## I. BACKGROUND

This court voted to rehear Nelson's case en banc because we are divided over how to interpret recent Supreme Court cases — Penry II, Tennard, and Smith — concerning Texas's pre-1991 death penalty statute. Three years ago, we reheard the Robertson case en banc because we were divided over interpretation of the Supreme Court's Texas death penalty case law leading up to and including Penry II.[1] The Court's continuing mixed signals on issues of critical importance to Texas's criminal justice system are unfortunate. It is to be hoped that, for the sake of certainty, the Court will clarify its jurisprudence in the cases on which it just granted certiorari.[2]

The majority opinion grants habeas relief to Nelson based on an adjective. It concludes that Nelson's mitigating evidence could not be given "full effect" by the jury at sentencing due to the inadequacy of the pre-1991 Texas death penalty special issues. It concludes, based on some language in the Court's opinions, that

---

[1]In 1992, we reheard the Graham case en banc for the same reason. Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc), aff'd, 506 U.S. 461, 113 S. Ct. 892 (1993).

[2]See Cole v. Dretke, 418 F.3d 494 (5th Cir. 2005), cert. granted, 2006 WL 1523202 (Oct. 13, 2006) (No. 05-11284); Brewer v. Dretke, 442 F.3d 273 (5th Cir. 2006), cert. granted, 2006 WL 1528242 (Oct. 13, 2006) (No. 05-11287).

108

"full effect," not just "some effect," is now the baseline for constitutionally adequate jury evaluation of a defendant's mitigating evidence.

This conclusion marks a surprising result in a habeas petition governed by AEDPA, which mandates affirmance of state criminal convictions unless the state court's decision was contrary to, or an unreasonable application of, federal law. First, Nelson proffered mitigating evidence of a sort that this court has frequently encountered: (1) his mother rejected him and he had no relationship with a child he had sired; (2) he was intoxicated by drugs and alcohol when he committed the crime; (3) he had troubled relationships with his brother and women; and (4) he suffered from a treatable borderline personality disorder. This court has upheld numerous capital sentences against claims that similar evidence could not be given sufficient effect by Texas juries under the pre-1991 statutes. The Supreme Court has frequently refused to review those decisions, and prisoners were executed.[3] Today's result

_____

[3]See, e.g., Hernandez v. Johnson, 248 F.3d 344 (5th Cir.), cert. denied sub nom. Hernandez v. Cockrell, 534 U.S. 1043, 122 S. Ct. 621 (2001); Emery v. Johnson, 139 F.3d 191 (5th Cir. 1997), cert. denied, 525 U.S. 969, 119 S. Ct. 418 (1998); Davis v. Scott, 51 F.3d 457 (5th Cir.), cert. denied, 516 U.S. 992, 116 S. Ct. 525 (1995); Jacobs v. Scott, 31 F.3d 1319 (5th Cir. 1994), cert. denied, 513 U.S. 1067, 115 S. Ct. 711 (1995); Lackey v. Scott, 28 F.3d 486 (5th Cir. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743 (1995); Clark v. Collins, 19 F.3d 959 (5th Cir. 1994), cert. denied, 513 U.S. 966, 115 S. Ct. 432 (1994); Motley v. Collins, 18 F.3d 1223 (5th Cir.), cert. denied, 513 U.S. 960, 115 S. Ct. 418 (1994); Madden v. Collins, 18 F.3d 304 (5th Cir. 1994), cert. denied, 513 U.S. 1156, 115 S. Ct. 1114 (1995); Russell v. Collins, 998 F.2d 1287 (5th Cir. 1993), cert. denied, 510 U.S.

suggests a "sea change"[4] from those decisions and their understanding of the Court's case law.

Second, the majority's reasoning implies that the <u>Penry</u> line of cases, which was described by the Court as an "exception" to the "rule," commencing with <u>Jurek</u>, of the overall constitutionality of the Texas sentencing issues,[5] has become the "new rule" to which <u>Jurek</u>, <u>Franklin</u>, <u>Graham</u>, and <u>Johnson</u> are now exceptions. Yet <u>Penry I</u> is self-described as "not a new rule" (which means that it may be applied retroactively in habeas cases),[6] and none of its progeny has altered that characterization. Even more potently, neither <u>Penry II</u>, <u>Tennard</u>, nor <u>Smith</u> overruled the other line of cases. If, however, "full effect" has become the test for mitigating evidence, rather than "some effect" or "within the

---

1185, 114 S. Ct. 1236 (1994); <u>Callins v. Collins</u>, 998 F.2d 269 (5th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1141, 114 S. Ct. 1127 (1994); <u>Drew v. Collins</u>, 964 F.2d 411 (5th Cir.), <u>cert. denied</u>, 509 U.S. 925, 113 S. Ct. 3044 (1993); <u>Lincecum v. Collins</u>, 958 F.2d 1271 (5th Cir.), <u>cert. denied</u>, 506 U.S. 957, 113 S. Ct. 417 (1992); <u>Barnard v. Collins</u>, 958 F.2d 634 (5th Cir. 1992), <u>cert. denied</u>, 506 U.S. 1057, 113 S. Ct. 990 (1993); <u>Mayo v. Lynaugh</u>, 893 F.2d 683 (5th Cir. 1990), <u>modified sub nom. Mayo v. Collins</u>, 920 F.2d 251 (5th Cir. 1990), <u>cert. denied</u>, 502 U.S. 898, 112 S. Ct. 272 (1991).

[4]<u>But cf. Johnson v. Texas</u>, 509 U.S. 350, 365, 113 S. Ct. 2658, 2668 (1993) (stating that <u>Penry</u> did not "effec[t] a sea change in this court's view of the constitutionality of the former Texas death penalty statute") (quoting <u>Graham</u>, 506 U.S. at 474, 113 S. Ct. at 901).

[5]<u>Graham</u>, 506 U.S. at 491, 113 S. Ct. at 910.

[6]<u>Penry v. Lynaugh</u>, 492 U.S. 302, 315, 109 S. Ct. 2934, 2945 (1989)(<u>Penry I</u>).

110

effective reach of the jury," then the majority's decision is irreconcilable with the <u>Jurek</u>-<u>Franklin</u>-<u>Johnson</u>-<u>Graham</u> line of cases.

This court cannot "underrule" the Supreme Court. Our duty is to harmonize its decisions as well as possible. We are always bound by the force of <u>stare</u> <u>decisis</u>, which caused Justice Kennedy to comment in <u>Johnson</u> that

> [t]he interests of the State of Texas, and of the victims whose rights it must vindicate, ought not to be turned aside when the State relies upon an interpretation of the Eighth Amendment approved by this Court, absent demonstration that our earlier cases were themselves a misinterpretation of some constitutional command.

<u>Johnson</u>, 509 U.S. at 366, 113 S. Ct. at 2668 (citations omitted).

## II.  THE "CLEARLY ESTABLISHED" LAW

With this preface, a closer analysis of the majority's opinion can begin. Billy Ray Nelson's habeas petition was rejected by the state courts for reasons that had nothing to do with this court's now-abandoned "constitutional relevance" and "uniquely severe" evidentiary thresholds. <u>See</u> <u>Tennard v. Dretke</u>, 542 U.S. 274, 124 S. Ct. 2562 (2004). The state courts conducted thoughtful and thorough analyses of Nelson's proffered mitigating evidence, and determined that all such evidence was sufficiently encompassed by the former Texas special issues and did not run afoul of <u>Penry v. Lynaugh</u>, 492 U.S. 302, 109 S. Ct. 2934 (1989)(<u>Penry I</u>).

111

Nevertheless, and despite the demanding AEDPA "unreasonableness standard,"[7] the majority now holds that Nelson is entitled to relief because there was a "reasonable likelihood" that Nelson's jury was prevented from giving "full effect" to his mitigating evidence. Whether the standard is that of "full effect" or something else is the principal issue before this court. Only last year, the author of today's majority opinion stated the test without a "full effect" gloss: "To grant relief on a Penry claim, we must determine (1) whether the mitigating evidence has met the 'low threshold for relevance,' and, if so, (2) that the evidence was beyond the effective scope of the jury." Bigby v. Dretke, 402 F.3d 551, 564-65 (5th Cir. 2005) (Stewart, J.) (citations omitted). The constitutional relevance of Nelson's mitigating evidence is not at issue here. But to say that a death penalty must be upheld unless such evidence was "beyond the effective scope of the jury," as Bigby does (and as this dissent advocates), is a

---

[7]The fact that a federal habeas court would have reached a different conclusion than did the state court is insufficient to merit habeas relief pursuant to AEDPA. See Brown v. Payton, 544 U.S. 133, 147, 125 S. Ct. 1432, 1442 (2005); Woodford v. Visciotti, 537 U.S. 19, 27, 123 S. Ct. 357, 361 (2002). The Court in Williams was careful to note that "an unreasonable application of federal law is different from an incorrect application of federal law," and, as such, the state court's application of federal law must be "objectively unreasonable," as opposed to merely incorrect, for habeas relief to be granted. Williams, 529 U.S. at 409-10, 120 S. Ct. at 1521-22 (emphasis in original); see also Penry v. Johnson, 532 U.S. 782, 793, 121 S. Ct. 1910, 1919 (2001)(Penry II). Consequently, this court overlooks the erroneous reasoning of state courts, and reviews the reasonableness of their ultimate decision. Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002)(en banc), cert. denied, 537 U.S. 1104, 123 S. Ct. 963 (2003).

112

much different test than whether such evidence could be given "full effect" by the jury.

The majority opinion cites every instance in which opinions of the Court — in dicta or dissents — have employed the term "full effect". Unfortunately, the course of the Court's jurisprudence, in our view, is far more complex than reliance on one adjective — "full" — would suggest.

In the beginning, in Jurek v. Texas, 428 U.S. 262, 96 S. Ct. 2950 (1976), the Supreme Court upheld the constitutionality of the Texas special issues, noting that Texas's sentencing scheme permitted the jury to "consider whatever evidence of mitigating circumstances the defense can bring before it." Id. at 273, 96 S. Ct. at 2957. The special issues were not seen to preclude the consideration of mitigating evidence, but rather, served to "guide[] and focus[] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender." Id. at 274, 96 S. Ct. at 2957. Such focusing was seen as beneficial, as it promoted evenhandedness by the jury, allowed an individualized assessment of the defendant's culpability, and guarded against arbitrary results. Cf. Lockett v. Ohio, 438 U.S. 586, 605-06, 98 S. Ct. 2954, 2965 (1978) (invalidating Ohio death penalty statute that altogether prevented the jury from considering relevant mitigating evidence; the Ohio statute was explicitly compared unfavorably to the Texas statute). There is thus no basis to conclude as a general matter that the

113

Texas special issues will fail to allow a jury to weigh a petitioner's mitigating evidence.

This assessment of the special issues was confirmed in Franklin v. Lynaugh, 487 U.S. 164, 108 S. Ct. 2320 (1988), as the Supreme Court again rejected a challenge to the constitutionality of the special issues. In that case the petitioner argued that mitigating evidence of his good behavior while in prison presented in his defense had relevance beyond the special issues, particularly the second special issue, which concerns "future dangerousness." In denying habeas, the Court held that all "relevant aspects" of the petitioner's character could be encompassed by the second special issue. Id. at 178, 108 S. Ct. at 2329. More important, in commenting on the adequacy of the special issues, the plurality qualified the broad statement in Eddings v. Oklahoma, 455 U.S. 101, 102 S. Ct. 869 (1982), that the sentencing jury may not be precluded from considering "any relevant, mitigating evidence." In the plurality's view, Eddings and Lockett did not prevent a state from "structuring or giving shape to the jury's consideration of . . . mitigating factors." Franklin, 487 U.S. at 179, 108 S. Ct. at 2330. The Court thus rejected the contention that a catch-all instruction allowing the jury an independent basis for rendering a sentence other than death was necessary, as such an instruction would overrule Jurek. Id. at 180 & n.10, 108 S. Ct. at 2330 & n.10. Jurek had approved the

114

Texas special issues, and the Court had repeatedly referred with approval to Texas's sentencing scheme, see Franklin, 487 U.S. at 182 n.11, 108 S. Ct. at 2331 n.11 (citing cases), precisely because it reconciled the Court's twin concerns for statutory structuring and for jury flexibility to consider mitigating evidence. Justice O'Connor's concurrence in the judgment presaged her view in Penry I that Jurek did not preclude a "claim that, in a particular case," the special issues were constitutionally inadequate. Penry I, 492 U.S. at 321, 109 S. Ct. at 2948. However, from Franklin, including Justice O'Connor's special concurrence, it is clear that the Texas special issues ought to be constitutional in the vast majority of cases.

Ultimately, the question of what exactly it means for a court to give "full consideration" to a habeas petitioner's mitigating evidence was answered in the cases of Graham v. Collins, 506 U.S. 461, 113 S. Ct. 892 (1993), and Johnson v. Texas, 509 U.S. 350, 113 S. Ct. 2658 (1993). Although Graham came to the Supreme Court on collateral, as opposed to direct, review, and was thus subject to analysis under Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989), the case was nevertheless instrumental in explaining the sufficiency of state death penalty statutes. In that case, the petitioner argued that evidence of his youth and transient upbringing had mitigating impact beyond the special issues. The Court rejected this contention, again turning to Jurek. Death penalty statutes only had to supply the defendant with a

115

"constitutionally adequate" consideration of his mitigating evidence, which Texas's special issues did. Graham, 506 U.S. at 470, 113 S. Ct. at 899. The majority explained Lockett, Eddings, Skipper,[8] Hitchcock,[9] and Penry I as being constitutionally defective because "relevant mitigating evidence was placed beyond the effective reach of the jury." Id. at 475, 113 S. Ct. at 902. The fact that the defendant's evidence might have "some arguable relevance" beyond the special issues did not invalidate the special issues. Id. at 475-76, 113 S. Ct. at 902. This is because "virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues." Id. at 476, 113 S. Ct. at 902. Again, citing Franklin and Jurek, the Court determined that Texas's death penalty statute allowed mitigating evidence to be adequately considered while permissibly focusing the considerations of the sentencing jury. Id. Graham, a majority opinion, thus stands for the proposition that a Texas jury may constitutionally render a sentence of death even where a defendant presents mitigating evidence that has some arguable relevance beyond the special issues.

---

[8]Skipper v. South Carolina, 476 U.S. 1, 106 S. Ct. 1669 (1986).

[9]Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821 (1987).

116

Just months later, a majority of the Court in <u>Johnson</u> reaffirmed the reasoning of <u>Graham</u>, in a direct appeal in which the appellant's youth as an offender was his major mitigating quality. Justice Kennedy's opinion drew heavily from <u>Graham</u>, re-emphasizing that while

> <u>Lockett</u> and <u>Eddings</u> prevent a state from placing relevant mitigating evidence beyond the effective reach of the sentencer, . . . we have held that there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and states are free to structure and shape mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty.

<u>Johnson</u>, 509 U.S. at 362, 113 S. Ct. at 2666 (citations and internal quotation marks omitted). Recapitulating the cases construing Texas's special issues, the Court confirmed a narrow interpretation of <u>Penry I</u>, "making it clear that [<u>Jurek</u>, <u>Lockett</u> and <u>Eddings</u>] can stand together with <u>Penry</u>." <u>Id.</u> at 365, 113 S. Ct. at 2667-68. The Court closely analyzed youthfulness as a mitigating factor and held that "there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth . . . ." <u>Id.</u> Penry's condition, in contrast, rendered him unable to learn from his mistakes and could only be considered to aggravate, not lessen, his future dangerousness.[10]

---

[10]The Court quoted Justice Brennan's dissent in <u>Blystone</u>, which acknowledged the ability of the Texas special issues to afford jury consideration of a defendant's moral culpability:

117

The Court concluded Johnson with the observation, originating in Graham, that Jurek would have to be overruled if, whenever a defendant proffers mitigating evidence "that has some arguable relevance beyond the special issues," a fourth jury issue in mitigation would be required.  Id. at 372, 113 S. Ct. at 2671. Such an issue, as the Court reasoned, would effectively abrogate the state's power, repeatedly affirmed by the Court, to structure the consideration of mitigating evidence.

Graham and Johnson are majority opinions of the Court.[11] Penry I is also a majority opinion, but Penry I represented a fact-specific exception to the Jurek line of cases.  This was made abundantly clear in Graham, 506 U.S. at 475, 113 S. Ct. at 902.

> [The two special issues] require the jury to do more than find facts supporting a legislatively defined aggravating circumstance. Instead, by focusing on the deliberateness of the defendant's actions and his future dangerousness, the questions compel the jury to make a moral judgment about the severity of the crime and the defendant's culpability. The Texas statute directs the imposition of the death penalty only after the jury has decided that the defendant's actions were sufficiently egregious to warrant death.

Id. at 371, 113 S. Ct. at 2671 (quoting Blystone v. Pennsylvania, 494 U.S. 299, 322, 110 S.Ct. 1078, 1091 (1990) (Brennan, J., dissenting)).

[11]Notably, in both Graham and Johnson, spirited dissents capture the same debate over "full effect" and "some effect" that preoccupies us still; but the advocates of "full effect" lost. See, e.g., Graham, 506 U.S. at 504, 113 S. Ct. at 917 (Souter, J., dissenting); Johnson, 509 U.S. at 374, 113 S. Ct. at 2672. (O'Connor, J., dissenting).

What distinguished <u>Penry I</u> from the aforementioned cases was that, according to Penry's experts, he had extremely poor impulse control, and, owing to his limited mental abilities, he was unable to appreciate the consequences of his actions or learn from his mistakes. Unlike the instant case, there was no suggestion that Penry's condition would improve; his brain damage was allegedly permanent. Such evidence might have diminished Penry's culpability, but it also served to indicate, as all sides agreed, that he would always be a threat to society. As such, with regard to the "future dangerousness" special issue, Penry's evidence served "only as an <u>aggravating</u> factor" for the jury. <u>Id.</u> at 323, 109 S. Ct. at 2949. The defense found itself in the unenviable position of arguing that a "juror should vote 'no' on one of the special issues even if she believed the State had proved the answer should be 'yes.'" <u>Id.</u> at 325, 109 S. Ct. at 2950. The prosecution in turn stressed that "the jurors had taken an oath to follow the law, and that they must follow the instructions." <u>Id.</u> This created a uniquely unfortunate situation in which a reasonable juror could credit the mitigating evidence and feel a sentence other than death was warranted for Penry, yet nevertheless be compelled to answer the special issues in the affirmative and render a sentence of death. Unlike <u>Graham</u> and <u>Johnson</u>, in which the juries had the ability to give at least "some effect" to the mitigating evidence presented by the defendants, it was "impossible to give meaningful mitigating effect" to Penry's evidence through

119

the special issues.  <u>Graham</u>, 506 U.S. at 474, 113 S. Ct. at 901.
The <u>Penry I</u> jury had "no vehicle for expressing the view that Penry
did not deserve to be sentenced to death."  <u>Penry I</u>, 492 U.S. at
326, 109 S. Ct. at 2951.[12]

To quote <u>Graham</u> again: "In <u>Penry</u>, the defendant's
evidence was placed before the sentencer but the sentencer had <u>no</u>
<u>reliable</u> <u>means</u> of giving mitigating effect to that evidence."
<u>Graham</u>, 506 U.S. at 475, 113 S. Ct at 902 (emphasis added).
<u>Penry I</u> was thus "limited . . . [in] its scope," as otherwise, it
could not be consistent with <u>Jurek</u> and <u>Lockett</u>, both of which were
repeatedly reaffirmed by the Court.  <u>Johnson</u>, 509 U.S. at 304,
113 S. Ct. at 2668.  In short, the "clearly established law" as of
1994 is not, as the majority argue, the <u>Penry I</u> "full effect" test,
but instead consists of <u>Penry I</u> together with <u>Graham</u>, <u>Johnson</u>,
<u>Franklin</u>, and <u>Jurek</u>.

The Court's subsequent decisions in <u>Penry II</u>, <u>Tennard v.</u>
<u>Dretke</u>, and <u>Smith v. Texas</u> have muddied the waters, but they have
not replaced, much less overruled, <u>Jurek</u>, <u>Franklin</u>, <u>Graham</u>, and
<u>Johnson</u>.  Each of the more recent cases resolves a narrow

---

[12]This reading of <u>Penry I</u> is entirely consistent with, and
indeed anticipates, the Court's later decision in <u>Penry v. Johnson</u>,
532 U.S. 782, 121 S. Ct. 1910 (2001)(<u>Penry II</u>).  As with <u>Penry I</u>,
the <u>Penry II</u> Court rejected as "arbitrary" a death penalty system
that would encourage a juror to provide a "false answer" to one of
the special issues, thereby violating his oath as a juror.  <u>Id.</u> at
801, 121 S. Ct. at 1923.  It is only in these rare circumstances
that a jury finds itself without a vehicle to provide a "reasoned
moral response" to the defendant's evidence.

procedural issue.  Penry II considered the sufficiency of a "nullification instruction" to the jury that Texas courts thought would alleviate the problem in Penry's case.  The Court explained why the nullification instruction would cause jurors to violate their oaths if they felt, notwithstanding that Penry's condition required a positive answer to his deliberateness and future dangerousness, he was less culpable because of his mental retardation.  The Court's opinion mentions "full effect" once, but its overruling of the nullification instruction was not tied to whether the jury could give "full effect" to Penry's mitigating evidence.  The jurors' catch-22 was independent of the amount of the mitigating effect.

In Tennard, the Court held that the Fifth Circuit's "uniquely severe permanent handicap" and "nexus" tests for identifying Penry evidence were incorrect, and that for COA purposes, "reasonable jurists would find debatable or wrong the District Court's disposition of Tennard's low-IQ-based Penry claim."  Tennard, 542 U.S. at 289, 124 S. Ct. at 2573.  Indeed, Tennard found that the petitioner's low IQ evidence had "the same essential features" as Penry's mental retardation evidence: His low IQ could be considered irrelevant to mitigation while having only aggravating relevance to his future dangerousness.  Id. at 288, 113 S. Ct. at 2572.  Tennard did not cite Graham or Johnson.

121

Because the decision expressly models its analysis on <u>Penry I</u>, it cannot be said to <u>extend</u> <u>Penry I</u> or to undercut <u>Graham</u> or <u>Johnson</u>.

Nowhere does <u>Tennard</u> require that the jury be able to give "full effect" to mitigating evidence in its sentencing deliberations. Instead, the Court quotes a potpourri of earlier decisions requiring states to enable the jury to "consider and give effect to" mitigating evidence;[13] forbidding states to "preclude the sentencer from considering any 'relevant mitigating evidence'";[14] and asserting virtually no limits on a defendant's ability to proffer relevant mitigating evidence.[15] <u>Tennard</u> compels Texas courts confronted with low IQ evidence to submit a proper special issue; <u>Tennard</u> also counsels fact-specific evaluation of petitioners' mitigation evidence for its application within the pre-1991 Texas special issues.

A final word about <u>Tennard</u>: Justice Kennedy concurred. Does this mean that he had changed his mind since he wrote <u>Johnson</u>, or that he viewed <u>Tennard</u> as reconcilable with <u>Johnson</u>? A "reasonable jurist" would draw the latter conclusion, since one can hardly assume Justice Kennedy would have failed to explain his

---

[13]<u>Boyde v. California</u>, 494 U.S. 370, 377-78, 110 S. Ct. 1190, 1196 (1990). <u>Boyde</u> held that jury discretion could be guided by the States.

[14]<u>Payne v. Tennessee</u>, 501 U.S. 808, 822, 111 S. Ct. 2597, 2606 (1991).

[15]<u>Eddings v. Oklahoma</u>, 455 U.S. 104, 114, 102 S. Ct. 869, 877 (1982).

departure from the very explicit cabining of <u>Penry I</u> that he accomplished with the majority opinion in <u>Johnson</u>.

<u>Smith v. Texas</u>, 543 U.S. 37, 125 S. Ct. 400 (2004), is the most recent case in the <u>Penry</u> line, and it, too, represents a narrow procedural holding. The Court reversed a Texas Court of Criminal Appeals decision that utilized the "constitutional relevance" tests adopted by the Fifth Circuit but rejected in <u>Tennard</u>, and purported to distinguish a nullification instruction from the instruction overruled by the Supreme Court in <u>Penry II</u>. That the Court would enforce its prior decisions with a per curiam reversal is hardly surprising. That the Court would employ such a brief opinion to expand the reach of <u>Penry I</u> and undermine <u>Graham</u> and <u>Johnson</u> <u>sub</u> <u>silentio</u> is unlikely. The majority in this case points to language supporting the "unlikely" reading. <u>Smith</u> initially quotes <u>Penry II</u> as holding a similar nullification instruction inadequate to enable a jury to give "full consideration" and "full effect" to defendant's mitigating circumstances. In the third paragraph of the decision, the Court states: "Approximately two years prior to the trial, we had held that presenting only these two special issues, without additional instructions regarding the jury's duty to consider mitigation evidence, violated the Eighth Amendment." <u>Id.</u> at 39, 125 S. Ct. at 402 (citation omitted). After explaining the plain errors in the state court's decision, the <u>Smith</u> Court states that: "as in <u>Penry II</u>, the burden of proof on the State was tied by law to

123

findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented." Id. at 48, 125 S. Ct. at 407 (footnote omitted). Smith's mitigation evidence included potentially organic learning disabilities and speech handicaps; low IQ and special education in school; good behavior in school; a drug-addicted criminal father; and his age of nineteen at the date of the offense. Smith concludes, without analysis of the types of mitigating evidence, that because it was "relevant mitigation evidence for the jury under Tennard and Penry I," the nullification instruction was inadequate under Penry II. Id. at 48-49, 125 S. Ct. at 407.

This court may not overlook the potentially broad language in Smith. On the other hand, Smith failed to cite or distinguish Jurek, Franklin, Graham, or Johnson. Since Chief Justice Rehnquist and Justice Kennedy joined Smith, the question again arises whether they did so in deference not just to a limited view of Penry II and Tennard but also, and without explanation, to a de facto overruling of Graham and Johnson through Smith's casual incorporation of the appellant's youth, good school behavior, and disadvantaged (not abused) childhood as Penry mitigation evidence.

Finally, notwithstanding Smith's two references to "full effect," the opinion also quotes Penry II as recognizing that "the key under Penry I is that the jury be able to 'consider and give effect to [a defendant's mitigation evidence] in imposing

124

sentence.'" Smith, 543 U.S. at 46, 125 S. Ct. at 406 (emphasis in original).

"Giving effect" to mitigating evidence is not the same as allowing a jury to give "full effect." The latter formulation, in effect, rejects a state's ability to focus the jury's consideration of mitigating evidence. Here lies the crux of our difference with today's majority opinion. Despite its efforts to turn narrow procedural decisions and imprecise language into a constitutional mandate of "full effect," the Supreme Court's case law will not support that conclusion. As an inferior court, we can overlook neither Jurek, Franklin, Graham, and Johnson, nor Penry I, Penry II, Tennard and Smith. Sadly, for the State of Texas, for certainty and stare decisis, and for defendants who deserve to know their fate before the last minute, we seem no further along in understanding the Court's pronouncements today than we were fifteen years ago when we reheard Graham en banc. See Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc), aff'd, 506 U.S. 461, 113 S. Ct. 892 (1993).

The interrelated rules we believe must be holistically drawn from the Court's decisions — until we are told otherwise — are as follows: First, courts must consider all mitigating evidence for its comprehensibility within the Texas special issues. Second, if, as with Penry I and Tennard low IQ evidence, the proffered evidence has only aggravating force beyond the issues of

125

deliberateness and future dangerousness, re-sentencing is required. In such cases, the proffered evidence was "beyond the effective reach of the jury" such that "the jury was precluded from considering the evidence." Third, evidence of such qualities as a defendant's youthfulness at the date of the crime and a "transient" upbringing[16] can, however, be considered within the special issues.

### III. THE MITIGATING EVIDENCE

Nelson offered in evidence that (1) his mother rejected him; (2) he had troubled relationships with his brother and women; (3) he was denied a relationship with his child; (4) he was intoxicated by drugs and alcohol when he committed the crime; and (5) he suffered from a <u>treatable</u> borderline personality disorder. The majority opinion dwells principally on the last element, subsidiarily on the rejection by his mother, and not at all on Nelson's substance abuse or other troubled relationships. Consequently, we focus on the first two characteristics. It must be pointed out, though, that the majority's "full effect" test apparently renders the pre-1991 Texas sentencing hearing constitutionally inadequate for any mitigating evidence except for youthfulness (and good behavior in prison).[17] After all, nearly any mitigating evidence can be said to have "some arguable relevance" beyond the deliberateness and future dangerousness inquiries.

---

[16]<u>See</u> <u>Graham</u>, 506 U.S. at 476, 113 S. Ct. at 902.

[17]<u>See</u> <u>Franklin</u>, 487 U.S. at 179 n.9, 108 S. Ct. at 2330 n.9.

126

Nelson's expert, Dr. Hickman, testified that Nelson had anger issues resulting from his childhood experiences, and that treatment for his borderline personality disorder would require long-term psychotherapy and medication. Hickman also suggested that individuals with borderline personality disorder tend to be difficult to treat, and success with Nelson was not guaranteed. However, Hickman further testified that if successfully treated, Nelson would no longer represent a danger to society.

Nelson's evidence is fundamentally distinguishable from that of Penry, who was presented as being beyond treatment because of an insufficient mental acuity and inability to learn from his mistakes. In contrast, Nelson's defense offered the jury evidence that Nelson could get better, and that if he spent the rest of his life in prison, he would no longer represent a future danger to society. Unlike Penry, but like the defendant in Graham, Nelson's attorneys could honestly and "vigorously urge[] the jury to answer 'no' to the special issues based upon" the evidence presented. Graham, 506 U.S. at 475, 113 S. Ct. at 902.

With regard to the "deliberateness" of the crime, Nelson's jury could have concluded, based on his maternally-deprived upbringing, his "anger issues" and his poor impulse control, that he did not sexually abuse his victims and murder Charla Wheat "deliberately." He was, in other words, too warped to have acted responsibly. Alternatively, the jury could have balanced these mitigating factors against his self-induced drug

127

abuse and intoxication, and the speculation embodied in Dr. Hickman's connecting his behavioral problems to the crime, and found this crime to be "deliberate."

Nelson's jury was also presented with clear alternatives in regard to future dangerousness. It could believe Hickman's testimony and conclude that Nelson was less morally culpable, given his mental illness, and that with proper treatment, Nelson would not present a future danger. Alternatively, the jury could follow the prosecution's theory that Nelson was fully culpable for his actions and would continue to be dangerous even in prison.[18] That the jury chose the latter assessment of Nelson does not mean that habeas relief must issue. Indeed, in order to even make a plausible argument that a Penry violation occurred in the instant case, the majority recasts the record to suggest that Nelson would be untreatable. This is simply not the case. Dr. Hickman's purpose for testifying was not just to illustrate Nelson's condition but to demonstrate his potential for change. That potential clearly found mitigating expression in both the "deliberateness" and "future dangerousness" issues.[19]

_____

[18]The prosecution did not agree with Hickman's assessment of Nelson's mental condition, as it did not have sufficient evidence to make a diagnosis. Its expert, Dr. Grigson, concluded only that Nelson would continue to pose a threat.

[19]The majority further relies upon a string of hypotheticals to create its Penry violation. If his jury believed that Nelson suffered from borderline personality disorder; if that jury believed that Nelson was untreatable or would not receive proper treatment in prison; and if that jury concluded that Nelson's

Because this case is reviewed under AEDPA, we must, as the majority acknowledges, find the state courts' resolution of the Penry issue not simply wrong, but unreasonable. Further, the "unreasonableness" must here stem from a conclusion that there is a "reasonable likelihood" — not a "mere possibility" — that the jury applied the two issues "in a way that prevents the consideration of constitutionally relevant evidence." Johnson, 509 U.S. at 367-68, 113 S. Ct. at 2669 (paraphrasing Boyde, 494 U.S. at 380, 110 S. Ct. at 1198). The "reasonable likelihood" standard is applied according to a "commonsense understanding of the record in the light of all that has taken place at the trial." Id. at 381, 110 S. Ct. at 1198. Finally, the fact that "a juror might view the evidence . . . as aggravating, as opposed to mitigating, does not mean that the rule of Lockett is violated." Johnson, 509 U.S. at 368, 113 S. Ct. at 2669. As illustrated above, there is no reasonable likelihood that the jury applied the special issues in an unconstitutional manner; in expressing its "reasoned moral response" to Nelson's evidence, the jury could have relied upon Hickman's testimony and concluded that Nelson would not remain a danger in prison. Based on our interpretation that

---

mental illness had aggravating effect as to the special issues, only then is it possible that the jury might have felt compelled to answer "yes" as to the future dangerousness special issue, even if the jury wished a sentence other than death due to Nelson's borderline condition. This attenuated theory of the jury deliberations extends Penry I far beyond its intended boundaries, without instructions from the Supreme Court.

129

Johnson and Graham remain good law, coexisting with Penry and its progeny, we cannot subscribe to the unreasonableness of the state courts' determination.

Clearly, the evidence of a treatable mental condition and a deprived family background could be afforded decisive, if perhaps not "full," mitigating effect under the pre-1991 sentencing scheme. The Court stated in Graham:

> We see no reason to regard the circumstances of Graham's family background and positive character traits in a different light [from Franklin]. Graham's evidence of transient upbringing [while his mother spent long periods hospitalized for a "nervous condition"] more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse.

Graham, 506 U.S. at 476, 113 S. Ct. at 902.

The Court, of course, held in Graham that to require an additional jury instruction would be a "new rule" of constitutional law. We do not pretend that Nelson's evidence of personality disorder and maternal rejection is on all fours with Jurek, Franklin, Graham, or Johnson. But the majority cannot pretend that such evidence — of a treatable mental condition and not "harsh physical abuse" — compels habeas relief based on Penry I, Penry II, Tennard or Smith.[20]

_____

[20]The holding of Graham, based on Teague, is that Penry I did not dictate constitutional relief based on the defendant's youthfulness. How, then, could the different evidence of a treatable mental disorder have become so indistinguishable from Penry as to render the state court's decision in this case

130

Reinforcing our conclusion is the inconsistency between the majority's analysis of a treatable mental disorder today and our court's analysis of an untreatable mental condition — schizophrenia — a year ago. See Bigby v. Dretke, 402 F.3d 551 (5th Cir. 2005). Today's majority overrules the decision in Lucas v. Johnson, 132 F.3d 1069 (5th Cir. 1998), which held that the Texas special issues furnished sufficient scope for a jury to give effect to evidence of a treatable mental condition. Id. at 1082-83. Last year, in Bigby, the author of today's opinion distinguished Lucas because of the different ramifications of a treatable mental disorder under the Texas special issues. Bigby, 402 F.3d at 571. If Bigby found no conflict between Lucas and the Court's decisions in the Penry line, how can the majority assert today that a comparable decision by the Texas courts was "unreasonable?"[21]

## IV. CONCLUSION

Nelson's evidence had constitutionally adequate mitigating effect as to both of the special issues, and his jury was neither foreclosed from giving effect to the evidence by the Texas special issues, nor was it put in the position of rendering

---

unreasonable?

[21]Today's majority decision is also squarely contrary to the recent decision in Cole v. Dretke, 418 F.3d 494 (5th Cir. 2005) cert. granted, that the "Texas special issues allowed the jury to give 'full consideration and full effect'" to Cole's mitigating evidence of a destructive family background. Id. at 511. Nevertheless, two members of today's majority panel joined the Cole decision.

131

a false verdict, as in <u>Penry I</u> and <u>Penry II</u>.  If the majority's expansive reading of <u>Penry</u> compels the result reached today, it is to be hoped that the Supreme Court will so inform us definitively in the cases now pending before it.  Because none of the Court's precedents to date compels the "full effect" test or the result reached by the majority, it cannot be said that the state courts unreasonably applied federal law.  I would deny habeas relief, and therefore, I respectfully dissent.

JERRY E. SMITH, Circuit Judge, dissenting:

I enthusiastically join the superb dissenting opinions penned respectively by Chief Judge Jones and Judges Clement and Owen. I dissent separately, not to discuss the merits of this case but to highlight the embarrassing procedural tangle caused by the various actions of the Supreme Court and this court in *Penry*-related cases.

In its *Penry* cases, this court has been inconsistent in deciding whether to (1) finalize a case and issue the mandate, (2) grant en banc rehearing, or (3) hold a case indefinitely. Presumably the instant case (*Nelson*) was taken en banc to reconcile this circuit's *Penry* jurisprudenceSSthat is, to harmonize our numerous *Penry*-related cases with each other and with the opaque pronouncements of the Supreme Court.[1] But if that were true, one would think the court would want to hold up on finalizing any *Penry* decisions until the en banc court has spoken. Instead, we have had a potpourri of actions on our various *Penry* cases. Any well-intentioned plan to step back and comprehensively review our *Penry* jurisprudence has crashed and burned.

---

[1]In its most recent explication of its habeas corpus jurisprudence, the Court has reminded us that in interpreting "clearly established Federal law" under 28 U.S.C. § 2254(d)(1), we look only to the Court's holdings and not its *dicta*. *Carey v. Musladin*, No. 05-785, 2006 U.S. LEXIS 9587, at *8-*9 (U.S. Dec. 11, 2006) (reversing a finding by the Ninth Circuit that the state court had unreasonably applied clearly established Federal law).

133

An examination of the time line in this court's *Penry* cases only adds to the confusion. The panel decision in *Nelson* was issued on August 12, 2003.[2] The Supreme Court issued *Tennard v. Dretke*, 542 U.S. 274 (2004), on June 24, 2004. Four days later the Court granted *certiorari*, vacated, and remanded *Nelson* "for further consideration in light of *Tennard* . . . ."[3]

On remand in *Nelson*, this court issued its panel opinion on March 1, 2006, stating that "[t]his death penalty case is reconsidered pursuant to the Supreme Court's instruction following its summary grant of certiorari and the vacating of our prior opinion based on *Tennard* . . . ."[4] No petition for rehearing or for rehearing en banc was ever filed in *Nelson*. Nonetheless, on March 13, 2006, this court, "on the Court's own motion," voted to rehear *Nelson* en banc.[5]

In *Tennard*, which is the most prominent recent Fifth Circuit *Penry* case, however, no judge held the mandate to await an en banc decision in *Nelson*. *Tennard* is the most significant of our current *Penry* cases because the Supreme Court vacated the panel opinion

---

[2]*See Nelson v. Cockrell*, 77 Fed. Appx. 209 (5th Cir. Aug. 12, 2003).

[3]*Nelson v. Dretke*, 542 U.S. 934 (June 28, 2004).

[4]*Nelson v. Dretke*, 2006 U.S. App. LEXIS 5272, at *1 (5th Cir. Mar. 1, 2006).

[5]*Nelson v. Dretke*, 442 F.3d 912, 912 (5th Cir. Mar. 13, 2006) (per curiam).

and, in an opinion by Justice O'Connor, rebuked this court for its approach to *Penry* questions.[6]  On remand in *Tennard*, a Fifth Circuit panel issued its opinion on March 1, 2006, which is coincidentally the same day the panel opinion in *Nelson*, remanded in light of *Tennard*, also issued.[7]  Yet, no judge held the mandate in *Tennard*, and no effort was made either to reconsider *Tennard* en banc or to put that case on hold pending en banc review in *Nelson*.  One can only guess that a significant fact for some judges was that the habeas petitioner had prevailed on remand in *Tennard*; moreover, the losing party (the state) did not petition for rehearing.

Other *Penry* cases of note were active at this time.  On November 15, 2004, the Supreme Court had vacated and remanded *Cole v. Dretke*, 99 Fed. Appx. 523 (5th Cir. May 19, 2004) (per curiam), for reconsideration in light of *Tennard*.[8]  The panel issued its opinion on remand in *Cole v. Dretke*, 418 F.3d 494 (5th Cir. July 22, 2005), and affirmed the judgment denying habeas relief.  In *Cole v. Dretke*, 443 F.3d 441 (5th Cir. Mar. 17, 2006) (per curiam), however, and unlike in *Nelson*, this court, after a poll, denied rehearing en banc over a strong dissent that included the following statement: "The responsible, efficient and just course . . . would have been

---

[6]*See Tennard*, 542 U.S. at 282-89 (2004) (O'Connor, J.).

[7]*See Tennard v. Dretke*, 442 F.3d 240 (5th Cir. Mar. 1, 2006).

[8]*See Abul-Kabir v. Dretke*, 543 U.S. 985 (Nov. 15, 2004).

. . . for us to resolve promptly en banc the important issues raised by the *Cole* panel decision and allow time for possible correction by the Supreme Court before permitting our numerous other death penalty panels to generate more decisions without either en banc or renewed Supreme Court guidance."[9]  This was four days after the court had granted en banc review in *Nelson*.

Also pending is *Coble v. Dretke*, 444 F.3d 345 (5th Cir. Mar. 22, 2006), in which the panel, vacating the opinion it had issued in *Coble v. Dretke*, 417 F.3d 508 (5th Cir. July 18, 2005), took specific account of the Supreme Court's decisions in *Tennard* and *Smith v. Texas*, 543 U.S. 37 (Nov. 15, 2004) (per curiam), in affirming the dismissal of the habeas petition.[10]  A judge placed a hold on the mandate in *Coble* from August 8, 2005, through March 22, 2006, and again from July 17, 2006, to the present.  A petition for rehearing en banc is pending in *Coble*, but there has been no en banc poll.

Somewhat similarly situated to *Coble* is the *Brewer* case, in which the panel issued its initial opinion on May 31, 2005.[11]  On June 21, 2005, a judge placed a hold on the mandate and has not released it in the intervening eighteen months.  On March 1,

_____

[9]*Cole*, 443 F.3d at 443 (Dennis, J., dissenting from denial of rehearing en banc).

[10]*Coble*, 444 F.3d at 358 n.11.

[11]*See Brewer v. Dretke*, 410 F.3d 773 (5th Cir. May 31, 2005).

136

2006SSthe same day the panel opinion issued in *Nelson*SSthe panel, in *Brewer v. Dretke*, 442 F.3d 273 (5th Cir. Mar. 1, 2006) (per curiam), denied the petition for panel rehearing (taking no action on the petition for rehearing en banc), withdrew its opinion, and issued a new one. A petition for rehearing en banc remains pending in *Brewer*.

And then there is, finally, *Garcia v. Quarterman*, 456 F.3d 463 (5th Cir. July 13, 2006). There the panel grappled with *Tennard* and with this court's relevant caselaw, including *Brewer* and *Bigby v. Dretke*, 402 F.3d 551 (5th Cir. Mar. 8, 2005), *cert. denied*, 126 S. Ct. 239 (2005). A judge held the mandate in *Garcia* on July 21, 2006, and a petition for rehearing en banc remains pending.

The Supreme Court's responses to the foregoing have been somewhat perplexing after the issuance of its latest (2004) opinion in *Tennard*. The most surprising development is that on October 13, 2006, the Court granted a petition for writ of *certiorari* in *Brewer*.[12] This is peculiar, because in *Brewer* the Fifth Circuit has not yet acted on the petition for rehearing en banc and has not issued the mandate. Possibly the High Court relied on the inaccurate statement in Brewer's *certiorari* petition that his "petition for rehearing *en banc* was eventually denied."[13] In fact, our order

---

[12]*See Brewer v. Quarterman*, 127 S. Ct. 433 (Oct. 13, 2006).

[13]Petition for Writ of *Certiorari* in No. 05-11287, *Brewer v. Quarterman*, at 2.

withdrawing the first opinion specifically stated that "[t]he petition for *panel* rehearing is DENIED."[14]  *Brewer* remains pending in this court, awaiting, at least in part, the issuance of the en banc decision in *Nelson*.

There is no jurisdictional bar to Supreme Court review of non-final cases from the courts of appeals, but it is unusual.[15]  Perhaps the Court, in granting review in *Brewer* despite its non-finality in this court, was influenced by Brewer's insistence that the "court's intervention is once again necessary to resolve once and for all the enduring confusion in the courts below regarding the scope of *Penry*."[16]  Yet, the postures of *Brewer*, *Coble*, and *Garcia* are the same in this court:  In all three, panel opinions denying habeas relief have been issued, petitions for rehearing en banc have been filed, and the mandates have been stayed.  The only difference is that in *Brewer* the petitioner, based on a mistaken view of the procedural status of the case in the court of appeals, filed a *certiorari* petition and has been rewarded (for whatever reason) with the Supreme Court's grant of review.

The Supreme Court has scheduled a trifecta of *Penry* cases for argument on January 17, 2007.  The same day it granted *certiorari*

---

[14]*Brewer*, 442 F.3d at 275 (emphasis added).

[15]Robert L. Stern et al., Supreme Court Practice 75-78 (8th ed. 2002) (citing 28 U.S.C. § 1254(1)).

[16]Petition for Writ of Certiorari, *supra*, at 13.

138

in *Brewer*, it also did so in *Cole*, with *Cole* and *Brewer* consolidated for argument.[17] One week before granting *certiorari* in *Brewer* and *Cole*, the Court granted review in a *Penry* case from the Texas state courts.[18]  The Court's willingness to address *Penry* questions once again is welcome.  Perhaps the High Court will issue a tongue-lashing like the one Justice O'Connor penned in *Tennard*.[19]  If so, it will be despite this court's honest attempts to apply the Court's sundry pronouncements.

As Chief Judge Jones wisely states in her dissent in *Nelson*, "[t]his court cannot 'underrule' the Supreme Court.  Our duty is to harmonize its decisions as well as possible.  We are always bound by the force of *stare decisis*."  So maybe, on the other hand, the current Court will determine that the various panels of this court, in the cases discussed above, have correctly applied the Court's

---

[17]*See Abdul-Kabir v. Quarterman*, 127 S. Ct. 432 (Oct. 13, 2006).

[18]*See Ex parte Smith*, 185 S.W.3d 455 (Tex. Crim. App. Mar. 1, 2006), *cert. granted*, 127 S. Ct. 377 (Oct. 6, 2006).

[19]"Despite paying lipservice to the principles guiding issuance of a COA, . . . the Fifth Circuit . . . invoked its own restrictive gloss on *Penry I* . . . ." *Tennard*, 542 U.S. at 283.  "The Fifth Circuit's test has no foundation in the decisions of this Court." *Id.* at 284.  "The Fifth Circuit was likewise wrong to have refused to consider the debatability of the *Penry* question . . . ." *Id.* at 287.  "[T]he Fifth Circuit's screening test has no basis in our precedents . . . ." *Id.*  It is interesting to note Justice O'Connor's repeated reference to this court not as "the Court of Appeals," but as "the Fifth Circuit," apparently to emphasize her obvious pique.

precedents, as my dissenting colleagues show in their able opinions.

In this regard, it is unfortunate that the en banc majority in *Nelson* has insisted on issuing its majority opinion at this time, in the wake of the grants of *certiorari* that I have noted. Instead, this court should have denied en banc rehearing in all the recent *Penry* cases (*Nelson*, *Brewer*, *Cole*, *Coble*, and *Garcia*), so as to give the Supreme Court the option of picking various ones of them for review. By our piecemeal and inconsistent approach, we have the incongruous situation of some cases held and others not, and of some with *certiorari* petitions and some not, and lastly of a case (*Nelson*) in which this court granted en banc review without even the benefit of a petition for rehearing, and now has insisted on issuing an en banc majority opinion in *Nelson* without the predictable guidance that will come from the Supreme Court's review in the cases to be argued on January 17. The en banc majority's rush to judgment is, in that sense, truly regrettable, and I respectfully dissent.

EDITH BROWN CLEMENT, Circuit Judge, with whom JONES, Chief Judge, JOLLY, SMITH, BARKSDALE, and GARZA Circuit Judges, join dissenting from the majority opinion:

AEDPA requires us to defer to the state habeas court's determination that the jury was not prevented from considering all the mitigating evidence within the special issues because that holding is neither contrary to nor an unreasonable application of Supreme Court precedent.[1] Accordingly, I respectfully dissent.

While this court has had many occasions to address *Penry* issues generally, the Supreme Court has spoken relatively very few times on the contentious issue presently before us: *Jurek* (youth, employment history, aid to family), *Franklin* (good behavior in prison), *Penry I* & *II* (mental retardation, child abuse), *Graham* (youth, transient upbringing, good character traits),[2] *Johnson* (youth), *Tennard* (constitutional relevance, low IQ), and *Smith* (constitutional relevance, *Penry II* instruction, youth, organic

---

[1]The district court quotes the following language from the state habeas court's decision: "The jury charge and the special issues allowed the jurors to give effect to all presented mitigating evidence in their answers to the special issues . . . ." D. Ct. Order at 37. A more precise statement, per *Boyde v. California*, 494 U.S. 370, 380 (1990), would have been that there is no reasonable likelihood that the jury applied the special issues in a way that prevented it from considering Nelson's mitigating evidence. Nonetheless, there is no material difference for purposes of our review.

[2]*Graham*, as the majority opinion notes, merely held that precedent in 1984 did not dictate that the petitioner should be granted relief based on his potentially mitigating evidence.

141

learning disability, low IQ, good behavior in school, drug-addicted father).  None of those cases deal *specifically* with the type of mitigating evidence offered by Nelson, *i.e.*, familial discord (rejection by his mother, trouble with his brother, inability to relate to his illegitimate child), drug and alcohol addiction and abuse, and (theoretically treatable) borderline personality disorder.  Further, none of those cases gave the Supreme Court the opportunity—now before us—to apply AEDPA principles to focus on the reasonableness of the state court's ruling rather than the merits of the petitioner's claim.[3]  Since the Supreme Court has not spoken to the precise type of mitigating evidence at issue here—and certainly had not done so by 1994, when Nelson's conviction became final—it will be difficult to say that, under AEDPA, the state habeas court acted contrary to or unreasonably applied federal law as determined by the Supreme Court.

The Supreme Court's decision in *Brown v. Payton*, 544 U.S. 133 (2005), is on-point and deserves more emphasis than the majority

---

[3]Only *Penry II* and *Tennard* are post-AEDPA federal habeas cases.  The majority opinion's contention that the Court was "fully aware of the analytical constraints imposed by the deferential AEDPA standard of review," Maj. Op. at 18, is a gentle way of obscuring that the Court did not decide whether the evidence fit within the special issues, since that question had been answered in *Penry I*.  Rather, the Court granted habeas relief based on the Texas trial court's use of a nullification instruction.  In *Tennard*, the Court similarly did not consider whether the mitigating evidence fit within the jury instructions.  Rather, the Court struck down this circuit's "constitutional relevance" screening test and remanded for further proceedings.

142

opinion grants it. There, the California Supreme Court, applying *Boyde v. California*, 494 U.S. 370 (1990), had held that there was no reasonable likelihood that the jury believed it was required to disregard the petitioner's mitigating evidence while applying the jury instructions.[4] *Payton*, 544 U.S. at 139. The Ninth Circuit, concluding that the state court unreasonably erred, granted habeas relief.[5] *Id.* at 140. Stringently applying AEDPA's deferential standard of review, the Supreme Court reversed the Ninth Circuit. *Id.* at 141–43. The Court held that, under AEDPA, "[e]ven on the assumption that [the state court's] conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review." *Id.* at 143. Concurring, Justice Breyer stated that, "In my view, this is a case in which Congress' instruction to defer to the reasonable conclusions of

---

[4]The challenged instructions included the "factor (k) instruction," which is California's version of a catch-all instruction. "[I]t directed jurors to consider any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Payton*, 544 U.S. at 137 (internal quotation marks and alteration omitted). Even though called a "catch-all," this instruction sometimes may act to preclude the jury from considering relevant mitigating evidence. *See Belmontes v. Brown*, 414 F.3d 1094, 1102 n.1 (9th Cir. 2005).

[5]The state court had held that Payton's mitigating evidence (sincere commitment to God, involvement in prison ministry, calming effect on other prisoners) of his post-crime behavior could be considered within the jury instructions. The Ninth Circuit granted habeas relief, believing that Supreme Court precedent upholding the factor (k) instruction applied only to pre-crime evidence. *Payton*, 544 U.S. at 140.

state-court judges makes a critical difference." *Id.* at 148 (Breyer, J., concurring).

> Were I a California state judge, I would likely hold that Payton's penalty-phase proceedings violated the Eighth Amendment. . . . [T]here might well have been a reasonable likelihood that [the] jury interpreted [the challenged jury instruction] in a way that prevent[ed] it from considering constitutionally relevant mitigating evidence. . . .
>
> Nonetheless . . . [, f]or the reasons that the Court discusses, I cannot say that the California Supreme Court decision fails [AEDPA's] deferential test.

*Id.* at 148–49 (fourth alteration in original) (internal quotation marks omitted).

While *Payton* does not address the Texas special issues, it nonetheless supports the proposition that, under AEDPA, federal courts sitting in habeas review of state convictions must defer to reasonable state court determinations regarding the constitutionality of jury instructions. Where, as here, there is no directly applicable Supreme Court precedent and the question is so close, a federal court cannot conclude that the state court unreasonably applied Supreme Court precedent. *See Payton*, 544 U.S. at 140 (noting that the Ninth Circuit "cited no precedent of this Court to support" its position that the state court acted contrary

144

to or unreasonably applied Supreme Court precedent).  *See also*
*Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may
not overrule a state court for simply holding a view different from
its own, when the precedent from this Court is, at best,
ambiguous.").[6]

Our circuit has spent considerable time and effort trying to
divine whether the jury was precluded from considering various
mitigating evidence within the confines of the special issues.
Such a close review of state court convictions is neither envisaged
nor permissible under the standard of review imposed by AEDPA.
Congress has limited the scope of our habeas review, and we must
accede.  Under that Congressionally-mandated deferential review, I
simply fail to see how a majority of this court can hold
unequivocally that the state habeas court not just has erred
(certainly a debatable prospect) but has erred *unreasonably* so as
to merit federal habeas relief.

---

[6]Though the majority opinion purports to apply AEDPA and not
merely disagree with the state habeas court decision, *see* Maj. Op.
at 24 & 35, the analysis and conclusion of the majority opinion
clearly show otherwise.  The question is not whether there is a
reasonable likelihood that the jury was precluded from giving
consideration and effect to Nelson's mitigating evidence, *see* Maj.
Op. at 2, 24, 29, 30, 33, & 41; rather, the question is whether it
was *unreasonable* for the state habeas court to hold that there was
*not* a reasonable likelihood that the jury was precluded from giving
consideration and effect to the mitigating evidence.  This latter
question sets a substantially higher bar to relief.

PRISCILLA RICHMAN OWEN, Circuit Judge, with whom JOLLY and SMITH, Circuit Judges, join dissenting:

The dissents of Chief Judge Jones and Judge Clement make salient points. I write to emphasize the standard of review that must be applied and that, given the state of the law when Nelson's conviction and sentence became final in 1994, the Texas court's application of United States Supreme Court precedent was not "objectively unreasonable."[1] The Supreme Court has admonished that in habeas review "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[2] The majority has failed to draw this distinction. It was not objectively unreasonable to conclude that Nelson's mitigating evidence was distinguishable from the mental retardation and low intelligence at issue in *Penry v. Lynaugh*

---

[1]*Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."); *see also Brown v. Payton*, 544 U.S. 133, 147 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (quoting *Williams*, 529 U.S. at 411)) (internal citations omitted).

[2]*Williams*, 529 U.S. at 410.

(*Penry I*),[3] *Tennard v. Dretke*,[4] and *Smith v. Texas*,[5] and was instead more similar to the transient qualities of youth at issue in *Johnson v. Texas*[6] and *Graham v. Collins*.[7]

## I

The Texas Court of Criminal Appeals affirmed Nelson's sentence on direct review in 1993, rejecting his argument that the special issues submitted to the jury failed to permit adequate consideration of mitigating evidence.[8]  That judgment became final when the United States Supreme Court denied review in 1994.[9] Nelson then initiated habeas corpus proceedings.

Habeas review in federal courts of state court proceedings is governed by 28 U.S.C § 2254, and the inquiry before us today is whether the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

---

[3]492 U.S. 302 (1989).

[4]542 U.S. 274 (2004).

[5]543 U.S. 37 (2004).

[6]509 U.S. 350 (1993).

[7]506 U.S. 461 (1993).

[8]*Nelson v. State*, 864 S.W.2d 496 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 1215 (1994).  The portion of the Texas Court of Criminal Appeals's opinion addressing Nelson's mitigating evidence and the special issues submitted to the jury is unpublished.

[9]510 U.S. at 1215.

United States."[10]  The Supreme Court has held that the phrase "clearly established Federal law, as determined by the Supreme Court" means "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."[11]

At the time the Texas Court of Criminal Appeals affirmed the judgment in Nelson's direct appeal, the Supreme Court's most recent pronouncements regarding the Texas special issues submitted in death penalty cases tried before 1991 were *Graham v. Collins*,[12] which considered a habeas petition, and *Johnson v. Texas*,[13] which was a direct review of a death sentence.  Both decisions extensively surveyed the Supreme Court's jurisprudence regarding mitigating evidence and the Texas special issues under consideration today.  In both *Graham* and *Johnson*, the primary

---

[10]28 U.S.C. § 2254(d)(1) (2000).

[11]*Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also id.* ("[W]hatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States.'") (referencing *Teague v. Lane*, 489 U.S. 288 (1989)).

[12]506 U.S. 461 (1993).

[13]509 U.S. 350 (1993).  The Texas Court of Criminal Appeals affirmed Nelson's conviction and sentence on May 26, 1993, before *Johnson v. Texas* issued, but the Texas court did not deny rehearing until October 6, 1993, after *Johnson* had issued on June 24, 1993.

question was whether the special issues allowed juries to give mitigating effect to a defendant's youth.[14]

In *Graham* and *Johnson*, the Supreme Court discussed its decision in *Penry I*, a habeas proceeding in which Penry presented evidence indicating that he had a low IQ, had mild to moderate mental retardation, and had been beaten and received multiple head injuries at an early age.[15] The Court held that the Texas special issues did not allow the jury to give effect to all of Penry's mitigating evidence.[16] Three issues were submitted to the jury, and a "no" answer to any of them would have resulted in a life sentence rather than the death penalty.[17]

The first special issue inquired if Penry acted "deliberately and with the reasonable expectation that the death of the deceased . . . would result."[18] The Supreme Court held that assuming the jury "understood 'deliberately' to mean something more than that Penry was guilty of 'intentionally' committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence."[19] Penry's mental retardation, while relevant

---

[14]*Graham*, 506 U.S. at 463; *Johnson*, 509 U.S. at 352.

[15]*Penry v. Lynaugh*, 492 U.S. 302, 307-09 (1989).

[16]*Id.* at 328.

[17]*Id.* at 310, 322-25.

[18]*Id.* at 322.

[19]*Id.*

to whether he was capable of acting "deliberately," also "'had relevance to [his] moral culpability.'"[20]  The Supreme Court concluded that because the first special issue did not "defin[e] 'deliberately' in a way that would clearly direct the jury to consider Penry's mitigating evidence as it bears on his personal culpability," the Supreme Court could not "be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue."[21]  The same could be said of Nelson's borderline personality disorder.

The second special issue inquired "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[22] In Penry's case, "one effect of his retardation [was] his inability

---

[20]*Id*. (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 185 (1988) (plurality opinion)).

[21]*Id*. at 323.  The Supreme Court further reasoned:

> Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately."  Thus, we cannot be sure that the jury's answer to the first special issue reflected a "reasoned moral response" to Penry's mitigating evidence.

*Id.*

[22]*Id.*

150

to learn from his mistakes."[23]  In *Penry I*, the Supreme Court reasoned that Penry's mental retardation was relevant to the future dangerousness issue but "only as an *aggravating* factor because it suggests a 'yes' answer to the question of future dangerousness."[24] The Court held, "The second special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse."[25]

Subsequently, in *Graham* the Supreme Court emphasized that the jury's answer to the second special issue in Penry's case could not give effect to the mitigating aspects of his mental retardation and abuse because "[a]lthough Penry's evidence of mental impairment and childhood abuse indeed had relevance to the 'future dangerousness' inquiry, its relevance was *aggravating* only."[26]  The *Graham* decision reasoned, "Penry's evidence compelled an affirmative answer to that [future dangerousness] inquiry, despite its mitigating significance."[27]  By contrast, in *Graham*, the defendant's youth "quite readily could have supported a negative answer."[28]

---

[23]*Id.*

[24]*Id.*

[25]*Id.* at 324.

[26]*Graham v. Collins*, 506 U.S. 461, 473 (1993).

[27]*Id.* at 475.

[28]*Id.* at 475-76.

The Supreme Court's decision a few months later in *Johnson* likewise draws a distinction between the type of evidence at issue in *Penry I* and certain other categories of mitigating evidence.[29] The Court re-confirmed that the constitutionality of jury submissions in death penalty cases turns on "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'"[30]   In making that determination, the *Johnson* decision sets forth at least three important, inter-related principles:   (1) even if a juror might view the evidence as both aggravating and mitigating, the Eighth Amendment has been satisfied "[a]s long as the mitigating evidence is within 'the effective reach of a sentencer,'"[31] (2) a state is not required to allow a jury "to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant,"[32] and (3) a state is permitted to structure consideration of relevant mitigating evidence as long as the jury is allowed to

---

[29]*Johnson v. Texas*, 509 U.S. 350, 368-70 (1993).

[30]*Id*. at 367 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

[31]*Id*. at 368 (quoting *Graham*, 506 U.S. at 475-76).

[32]*Id*. at 372.

give effect to that evidence through at least one vehicle in making the sentencing decision.[33]

In *Johnson*, the Supreme Court expressly rejected the argument "that the forward-looking perspective of the future dangerousness inquiry did not allow the jury to take account of how petitioner's youth bore upon his personal culpability for the murder he committed."[34] The Supreme Court reasoned that the "forward-looking inquiry is not independent of an assessment of personal culpability. It is both logical and fair for the jury to make its determination of a defendant's future dangerousness by asking the extent to which youth influenced the defendant's conduct."[35] The Court also expressly rejected the related argument that the Texas special issues did not permit the jury "to make a 'reasoned moral response'" to the defendant's youth because the issue inquired only about future dangerousness.[36] The Court concluded that the use of the term "continuing threat to society" in the future dangerousness

---

[33]*Id.* at 370; *see also id.* at 373 ("To rule in petitioner's favor, we would have to require that a jury be instructed in a manner that leaves it free to depart from the special issues in every case. This would, of course, remove all power on the part of the States to structure the consideration of mitigating evidence—a result we have been consistent in rejecting.").

[34]*Id.* at 369.

[35]*Id.; see also Ayers v. Belmontes*, 127 S.Ct. 469, 475 (2006) (citing *Johnson*, 509 U.S. at 369, for the proposition that "the 'forward-looking' future-dangerousness inquiry 'is not independent of an assessment of personal culpability.'").

[36]*Johnson*, 509 U.S. at 370.

153

special issue "afford[ed] the jury room for independent judgment in reaching its decision," explaining, "Indeed, we cannot forget that 'a Texas capital jury deliberating over the Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in "pure balancing" States.'"[37]

Perhaps most importantly, the Supreme Court held in *Johnson* that a state may structure consideration of mitigating evidence and that providing one vehicle through which to give effect to mitigating evidence satisfies constitutional requirements.[38] The Court explained, "It is true that Texas has structured consideration of the relevant qualities of petitioner's youth, but in so doing, the State still 'allow[s] the jury to give effect to [this] mitigating evidence in making the sentencing decision.'"[39] A state is not required to provide more than one avenue for giving effect to mitigating evidence: "Although Texas might have provided other vehicles for consideration of petitioner's youth, no additional instruction beyond that given as to future dangerousness

---

[37]*Id*. at 370-71 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 182 n.12 (1988) (plurality opinion)).

[38]*Id*. at 370.

[39]*Id*. (quoting *Saffle v. Parks*, 494 U.S. 484, 491 (1990)).

was required in order for the jury to be able to consider the mitigating qualities of youth presented to it."[40]

In answering the relevant question on direct review of a death sentence, which is "whether the Texas special issues allowed adequate consideration" of mitigating evidence,[41] the Supreme Court reiterated in *Johnson* that "a reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'"[42] The Court found no such likelihood with regard to a defendant's youth. "If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness."[43]

## II

Against this backdrop, we must determine whether the Texas court decided Nelson's case "differently than [the Supreme] Court has on a set of materially indistinguishable facts."[44] As noted,

---

[40]*Id.*

[41]*Id.* at 367.

[42]*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

[43]*Id.* at 370.

[44]*Williams v. Taylor*, 529 U.S. 362, 413 (2000) (construing 28 U.S.C. § 2254(d)(1), which provides, "An application for a writ of habeas corpus . . . shall not be granted . . . unless the

155

this is not a direct appeal; Nelson seeks a writ of habeas corpus. "[A] federal habeas court making the 'unreasonable application' inquiry [under 28 U.S.C. § 2254(d)(1)] should ask whether the state court's application of clearly established federal law was objectively unreasonable."[45] In light of *Penry I*, *Graham*, and *Johnson*, it cannot be said that it would be objectively unreasonable to conclude that Nelson's mitigating evidence is distinguishable from Penry's evidence or is more comparable to Graham's and Johnson's youth. Even if a court might conclude, as the majority in this case does, that the Texas court incorrectly applied federal law, that is not a basis for granting habeas relief. Again, the Supreme Court has held that "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[46]

Unlike mental retardation or low intelligence, which are generally static conditions, the evidence regarding Nelson's borderline personality disorder is not solely aggravating with

---

adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"); *see also id.* at 406 ("A state-court decision will . . . be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.").

[45]*Id.* at 409.

[46]*Id.* at 410.

regard to his future dangerousness.  The majority opinion and Chief

Judge Jones's dissent describe the expert testimony in some detail,

and I will not duplicate those discussions.  The important point is

that although Nelson's expert witness conceded that those suffering

from borderline personality disorder can be difficult to treat and

there was no guarantee Nelson's treatment would be successful, the

expert opined that Nelson's disorder was treatable with medication

and psychotherapy over a period of two to five years.  I agree with

Judge Clement's dissenting opinion that Nelson's borderline

personality disorder falls somewhere on a continuum between Penry's

mental retardation and Graham's youth.[47]

The established law in *Johnson* and *Graham* is that the

attributes of youth place it in a different category than mental

retardation:  "The relevance of youth as a mitigating factor

derives from the fact that the signature qualities of youth are

transient; as individuals mature, the impetuousness and

recklessness that may dominate in younger years can subside."[48]  A

jury can give adequate effect to the mitigating aspects of youth in

answering the future dangerousness issue because the "forward-

looking inquiry is not independent of an assessment of personal

---

[47]*See Graham v. Collins*, 506 U.S. 461, 475 (1993) ("The jury was not forbidden to accept the suggestion of Graham's lawyers that his brief spasm of criminal activity in May 1981 was properly viewed, in light of his youth, his background, and his character, as an aberration that was not likely to be repeated.").

[48]*Johnson*, 509 U.S. at 368.

culpability.  It is both logical and fair for the jury to make its determination of a defendant's future dangerousness by asking the extent to which youth influenced the defendant's conduct."[49]  The future dangerousness issue is adequate even though a jury is free to conclude that youth did not influence the defendant's conduct or that the attributes of youth, such as impetuousness and recklessness, will not subside as to this defendant.  It was not unreasonable for the Texas court to conclude that the same can be said of the evidence regarding Nelson's borderline personality disorder and the prospects for its treatment.  The jury may have concluded that Nelson's disorder was treatable, or that it was not, just as juries may conclude that the attributes of youth are not transient as to a particular defendant.  A court conducting a direct review of the Texas court's decision to place the evidence of Nelson's borderline personality disorder in the same category as youth might conclude that the Texas court erred, but it was not unreasonable for the Texas court to treat Nelson's evidence as similar to evidence of youth, given the Supreme Court's precedent.

The evidence also reflected that Nelson's mother did not love him and shunned him.  Nelson's expert testified that his mother's conduct likely contributed to or exacerbated Nelson's borderline personality disorder.  To the extent Nelson's abusive treatment from his mother must be considered independently from his mental

[49] *Id.* at 369.

condition, it is not unreasonable to conclude that this evidence, as well as evidence regarding Nelson's troubled relationships with his brother and women and his inability to have a relationship with his child born out of wedlock, is more similar to "Graham's evidence of transient upbringing and otherwise nonviolent character"[50] than it is to the harsh, physical abuse inflicted upon Penry as a child.[51]  The Texas court did not unreasonably apply the Supreme Court's holding in *Graham* and *Johnson* that additional instructions or an additional jury issue are not required simply because mitigating evidence has some arguable relevance beyond the special issues.  The Supreme Court said in both *Graham* and *Johnson*:

> [H]olding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues . . . would be to require in all cases that a fourth "special issue" be put to the jury:  "'Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to believe that the death penalty should not be imposed?'"[52]

The Court observed that "[t]he first casualty of a holding [that would require an additional issue whenever evidence had some relevance beyond the special issues] would be *Jurek*.  The inevitable consequence of petitioner's argument is that the Texas

---

[50]*Graham*, 506 U.S. at 476.

[51]*Penry v. Lynaugh*, 492 U.S. 302, 308-09 (1989).

[52]*Johnson*, 509 U.S. at 372 (quoting *Graham*, 506 U.S. at 476 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 180 n. 10 (1988) (plurality opinion))).

special issues system in almost every case would have to be supplemented by a further instruction."[53]  The Supreme Court held that as long as "a jury [was] able to consider in some manner all of a defendant's relevant mitigating evidence," a state was not required to allow a jury "to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant."[54] The Texas court was not unreasonable in applying this precedent.

Additionally, during closing arguments, the prosecutor twice suggested that the jury might conclude that Nelson was not morally culpable for the murder because of his mother's or others' treatment of him and urged the jurors not to do so.[55]  This indicates it was unlikely the jury thought that it could not give effect to evidence of childhood abuse in considering Nelson's moral culpability and answering the future dangerousness issue.  As was the case in *Ayers v. Belmontes*, "It is improbable the jurors believed that the parties were engaging in an exercise in futility

---

[53]*Id.* (referencing *Jurek v. Texas*, 428 U.S. 262 (1976)).

[54]*Id.* ("In addition to overruling *Jurek*, accepting petitioner's arguments would entail an alteration of the rule of *Lockett* [*v. Ohio*, 438 U.S. 586 (1978)] and *Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982)].").

[55]The prosecutor argued, "You are going to hear some Billy, Billy, Billy, Billy, and before this is all said and done, this whole grizzly, horrible thing is going to be hung around the neck of his mother," and, "We live – like I say, we are going to hang this, before it is over we are going to hang it around the neck of some school teacher or some football coach.  We are going to hang this around the neck of everybody but him."

160

when respondent presented (and both counsel later discussed) his mitigating evidence in open court."[56] At the very least, the record indicates that the Texas court would not have been unreasonable in concluding the jury could give effect to this evidence.

As to evidence of Nelson's substance abuse, no one questions that the deliberateness issue provided an adequate vehicle.

## III

The Supreme Court's post-1994 decisions in *Penry v. Johnson* (*Penry II*),[57] *Tennard v. Dretke*,[58] and *Smith v. Texas*[59] do not render the Texas court's application of established Supreme Court precedent unreasonable. None of those decisions holds that additional instructions or another issue is necessary when mitigating evidence can be given effect in answering either the "deliberately" special issue or the "future dangerousness" special issue under pre-1991 Texas law.

In *Penry II*, Penry had been retried subsequent to *Penry I*, and the trial court submitted a third issue, in addition to the "deliberately" and "future dangerousness" issues.[60] The Supreme Court held that the third issue was subject to two possible

---

[56]127 S. Ct. 469, 476 (2006).

[57]532 U.S. 782 (2001).

[58]542 U.S. 274 (2004).

[59]543 U.S. 37 (2004).

[60]*Penry II*, 532 U.S. at 786.

161

interpretations, and that neither interpretation cured the infirmity of the first two issues as applied to Penry's evidence.[61] The third issue either had no practical effect[62] or essentially directed the jury to change truthful "yes" answers to the first two issues to "no."[63]

In *Penry II*, in a "*see also*" cite, the Court quoted from Justice O'Connor's dissent in *Johnson*, noting in a parenthetical, "'[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances' (emphasis in original)."[64] But in the very next sentence, the Court adhered to *Penry I*, requiring only "a 'vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision.'"[65] The reference to "*full* effect" and "*full* consideration" cannot be taken as a retraction of one of *Johnson*'s core holdings: "Although Texas might have provided other vehicles for consideration of petitioner's [mitigating evidence], no additional instruction beyond that given as to future dangerousness was required in order

---

[61]*Id*. at 798.

[62]*Id*.

[63]*Id*. at 799.

[64]*Id*. at 797 (quoting *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (O'Connor, J., dissenting)).

[65]*Id*. (quoting *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989)) (emphasis added).

for the jury to be able to consider the mitigating qualities of youth presented to it."[66]

In *Tennard*, the Supreme Court considered in some detail what constitutes mitigating evidence, explaining that the threshold was a low one in deciding if there was a mitigating aspect.[67] The Court rejected this circuit's "uniquely severe permanent handicap" and "nexus" tests and held "that reasonable jurists would find debatable or wrong" the state court's disposition of "Tennard's low-IQ-based *Penry* claim."[68]

In *Smith*, the Supreme Court again quoted the passage from Justice O'Connor's dissenting opinion in *Johnson* that said a sentencer must be allowed to give "'*full* effect to mitigating circumstances.'"[69] At issue was a nullification question, similar but not identical to the one submitted in *Penry II*,[70] that "'essentially instructed [the jury] to return a false answer to a special issue in order to avoid a death sentence.'"[71] The Supreme

---

[66]*Johnson*, 509 U.S. at 370.

[67]*Tennard v. Dretke*, 542 U.S. 274, 282-89 (2004).

[68]*Id*. at 289.

[69]*Smith v. Texas*, 543 U.S. 37, 46 (2004) (quoting *Johnson*, 509 U.S. at 381 (O'Connor, J., dissenting)).

[70]*Penry v. Johnson*, 532 U.S. 782, 797-98 (2001).

[71]*Smith*, 543 U.S. at 48 (quoting *Penry II*, 532 U.S. at 801).

Court explained in *Smith* the import of its holdings in *Tennard* and

*Penry II*:

> Rather, we held that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "'evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'"[72]

The Court held in *Smith* that "the burden of proof on the State was

tied by law to findings of deliberateness and future dangerousness

that had little, if anything, to do with the mitigation evidence

petitioner presented."[73]  Smith had a low IQ and was placed in

special education classes, indicating low intelligence, a condition

that was not transient or treatable.[74]  Similarly, in *Tennard*, the

defendant had an IQ of 67, indicating low intelligence.[75]  No

mitigating effect could be given to low intelligence through a

jury's answer to the future dangerousness issue.[76]  It is not

unreasonable to conclude that Nelson's borderline personality

disorder and potential treatment for that condition is

---

[72]*Id.* at 44 (quoting *Tennard*, 542 U.S. at 284-85 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990))) (internal quotation omitted).

[73]*Id.* at 48.

[74]*Id.* at 41.

[75]542 U.S. at 277.

[76]*Id.* at 288-89.

distinguishable from Smith's and Tennard's mitigating circumstances in this regard.

Neither *Tennard* nor *Smith* purports to overrule the holding in *Johnson* that a state is only required to provide one avenue for giving effect to mitigating evidence, not multiple vehicles.[77] A "no" answer to the future dangerousness issue based on Nelson's mitigating evidence would have given full effect to that evidence. To paraphrase *Johnson*, if any jurors believed that Nelson's borderline personality disorder was transient because it was treatable and his condition made him less culpable for murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating Nelson's future dangerousness.[78]

\* \* \* \* \*

The Texas court was not objectively unreasonable in applying the Supreme Court's established precedent to the facts presented. It was not objectively unreasonable to conclude that evidence of Nelson's borderline personality disorder and the prospects for its treatment was less similar to mental retardation[79] and low

---

[77]*See Johnson v. Texas*, 509 U.S. 350, 370 (1993).

[78]*See id*.

[79]*See Penry v. Lynaugh*, 492 U.S. 302, 322 (1989).

165

intelligence[80] and more similar to the transient qualities of youth.[81]  Accordingly, I dissent.

---

[80]*See Smith v. Texas*, 543 U.S. 37, 41 (2004); *see also Tennard*, 542 U.S. at 277.

[81]*See Johnson*, 509 U.S. at 368; *see also Graham v.Collins*, 506 U.S. 461, 463-64 (1993).